IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**WAL-MART STORES, INC.**                                    **PLAINTIFF/**
                                                            **COUNTER-DEFENDANT**

**V.**                          **CASE NO. 5:14-CV-5262**

**CUKER INTERACTIVE, LLC**                                   **DEFENDANT/**
                                                            **COUNTER-CLAIMANT**

<u>MEMORANDUM OPINION AND ORDER</u>

Currently before the Court are:

- Defendant Cuker Interactive, LLC's ("Cuker") Motion for Partial Summary Judgment (Doc. 121), Statement of Undisputed Material Facts (Doc. 122-1), and Brief in Support (Doc. 123-1); Plaintiff Wal-Mart Stores, Inc.'s ("Walmart") Response in Opposition (Doc. 128-1) and Response to Cuker's Statement of Undisputed Material Facts (Doc. 129-1); and Cuker's Reply (Doc. 132); and

- Walmart's Motion for Summary Judgment as to Counterclaim (Doc. 86), Brief in Support (Doc. 87-1), and Statement of Undisputed Material Facts (Doc. 88-1); Cuker's Response (Doc. 108) and Statement of Disputed Material Facts (Doc. 109); and Walmart's Reply (Doc. 115-1).

For the reasons given below, Cuker's Motion is **DENIED**, and Walmart's Motion is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

On January 30, 2014, Walmart and Cuker signed a contract under which Walmart agreed to pay Cuker a fixed fee of $577,719, in exchange for Cuker's provision of certain

services to help make the website for Walmart's "ASDA Groceries business" responsive, irrespective of the device on which it is being viewed, such as a desktop or a mobile phone. *See* Doc. 124-7, pp. 8, 17. Walmart was facing very tight internal deadlines for this project, and the contract-negotiation process was a very speedy one, taking merely a few weeks rather than the months that were more typical. *See* Doc. 121-1, p. 3. The project launched almost immediately in early February, and by the end of that month the parties were already experiencing fundamental disagreements on matters such as whether various milestones for performance were strict deadlines or mere aspirations, when interim fee payments were due, how many rounds of revisions Walmart could require Cuker to make to its deliverables, and whether particular demands by Walmart were outside of the scope of work that Cuker had contracted to deliver.

Eventually the relationship broke down irreparably, and the instant lawsuit commenced. In the most recent versions of the pleadings, Walmart asserts two claims against Cuker for breach of contract and declaratory judgment, and Cuker asserts six counterclaims against Walmart for declaratory judgment, fraudulent inducement, misappropriation of trade secrets, breach of contract, unjust enrichment, and injunctive relief. Walmart has moved for summary judgment on all of Cuker's counterclaims, and Cuker has moved for summary judgment solely on its counterclaim for declaratory judgment. Both motions have been fully briefed and are ripe for decision.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, cross-motions for summary judgment are

filed, each motion should be reviewed in its own right, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1998). The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999). These specific facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.  DISCUSSION

### A.  Count One of Counterclaim: Declaratory Judgment that Contract is Void

Under Arkansas law, "the essential elements of a contract are (1) competent parties; (2) subject matter; (3) legal consideration; (4) mutual agreement; and (5) mutual obligations." *Independence Cnty. v. City of Clarksville*, 2012 Ark. 17, at *6; 386 S.W.3d 395. In Count One of its Amended Counterclaim, Cuker seeks "a declaratory judgment that the Contract is void, invalid and unenforceable based on lack of mutual assent," *i.e.*, based on the absence of mutual agreement. (Doc. 61-1, ¶ 41). The parties have filed cross-motions for summary judgment on this Count.

Arkansas courts are guided by two legal principles when deciding whether parties entered into a valid contract:

> (1) a court cannot make a contract for the parties but can only construe and enforce the contract that they have made; and if there is no meeting of the minds, there is no contract; and (2) it is well settled that in order to make a contract there must be a meeting of the minds as to all terms, using objective indicators.

*DaimerChrysler Corp. v. Smelser*, 375 Ark. 216, 218–19; 289 S.W.3d 466 (2008). Whether a meeting of minds occurred is a question of fact. *Id.* at 219. Thus, when determining whether any material factual dispute exists on this point, the Court must "use an objective test for determining whether there was mutual assent without consideration of the parties' subjective opinions," and with special attention to the language of the alleged contract as well as to the parties' actions. *See FutureFuel Chem. Co. v. Lonza, Inc.*, 756 F.3d 641, 646–47 (8th Cir. 2014).

The instant contract contains a general "Agreement" as well as, *inter alia*, a Statement of Work ("SOW"), attached to the Agreement as Exhibit A. *See* Doc. 124-7, p. 8. The Agreement explicitly obligates Cuker and Walmart to provide the services and pay the fees, respectively, that are identified in the SOW. *Id.* at p. 2, § 1. The services are described in Section III of the SOW, entitled "Scope of Work." Section VI of the SOW, entitled "Milestones," sets forth a table containing "target milestones for the project timeline," with target "Completion Date[s]" for thirteen separate "Milestones/Deliverables" which Cuker "will make the best possible effort to meet," with accompanying fee amounts to be invoiced by Cuker and paid by Walmart, totaling a fixed fee of $577,719. *Id.* at pp. 15–16. Section X of the SOW, entitled "Fees," states that "[a]ll invoices for fees and expenses are payable 45 days after receipt of invoice." *Id.* at p. 17.

Section 3 of the Agreement, entitled "Ownership of Deliverables," states that "[e]xcept as . . . otherwise specified in a Statement of Work, all Deliverables (or any portion or [sic] a Deliverable) authored . . . for Walmart by [Cuker] . . . are the exclusive property of Walmart, *id.* at p. 2, § 3(a), that "Deliverables must not include, and [Cuker] may not incorporate, [Cuker]'s preexisting proprietary information," *id.* at p. 3, § 3(c), and that if Cuker nevertheless includes such preexisting proprietary information among its Deliverables, then Cuker "grants to Walmart a nonexclusive, worldwide, royalty-free, irrevocable, perpetual license to use [etc.] . . . [Cuker's] Intellectual Property," *id.* Despite this apparently technical use of the word "Deliverables," that word is never actually defined anywhere in the Agreement or the SOW, though as noted above, it appears to be identified with "Milestones" in Section VI of the SOW.

At various points throughout the "Scope of Work" Section of the SOW, Cuker is obligated to provide "wireframes" and "[s]econdary page design comps" for "the sections *listed in the site map below.*" *Id.* at p. 9, § III.e.2 & g.2 (emphasis added). Cuker is also obligated to "develop a responsive front-end by adding to the existing front-end code on all of the page templates *defined in the scope*," *id.* at p. 9, § III.h.2 (emphasis added), and to provide Walmart a "responsive template guide," *id.* at p. 12, § III.l.1.a. Neither the Agreement nor the SOW ever actually defines the word "template." However, Subsection k of the "Scope of Work" Section of the SOW, entitled "Site Map," opens with the following statement: "The site map below is a working version it [sic] will be refined during the design and planning process. The price is based upon the design of responsive desktop, tablet, and smartphone layouts for home page, navigation, 10 page templates, and responsive template guide." *Id.* at p. 11. The Agreement explicitly states that the scope

of work may not be changed unless *both* parties to the Agreement sign a Project Change Request ("PCR") in the form attached as Exhibit B to the Agreement. *See id.* at p. 2, § 1. The Agreement and the SOW both explicitly state that fixed fees for Services may not be increased through a PCR unless the PCR expressly provides for such increase. *See id.* & at p. 17, § X.A.

The Court interprets the site map in Subsection k of the SOW as being a "working" description of those portions of the ASDA website which Cuker was agreeing to help make responsive, with the specifics to "be refined during the design and planning process." But regardless of that site map's initial contents and regardless of what form its refinements would ultimately take, the Court also interprets Subsection k's language regarding what "[t]he price is based upon" as placing a hard categorical limit on the quantity of work that Cuker was agreeing to do for the fee of $577,719. In other words, the contract does not permit the fee to be altered, or the scope of work to be expanded beyond "the design of responsive desktop, tablet, and smartphone layouts for home page, navigation, 10 page templates, and responsive template guide," except through a PCR or new SOW. Refinement of Subsection k's site map without a PCR or new SOW neither alters the fee nor expands the scope of work; it simply fleshes out a description of the terrain where Walmart and Cuker have agreed the work may be done.

In its briefing, Cuker points to an abundance of evidence in the record that throughout the parties' relationship, Walmart and Cuker held very different understandings of exactly how far the boundaries of the SOW's scope of work extended. However, as Walmart correctly points out, even if this mismatch were the result of some ambiguity in the contract, "ambiguity does not prevent the formation of a contract; rather,

it calls for interpretation of a contract." *Aon Risk Servs., Inc. v. Meadors*, 100 Ark. App. 272, 282, 267 S.W.3d 603 (2007).  At any rate, this is not a situation where the parties "agree[d] to terms that reasonably appear[ed] to each of them to be unequivocal" but that were subsequently revealed to be fundamentally incompatible.  *Cf. Colfax Envelope Corp. v. Local No. 458-3M, Chicago Graphic Comms. Int'l Union*, 20 F.2d 750 (7th Cir. 1994) (referencing the famous English case of *Raffles v. Wichelhaus*, in which the parties contracted for shipment of goods with reference to a ship named "*Peerless*" without realizing they were each referring to different ships by the same name).

Cuker further argues that aside from the scope of work, the contract also lacked mutual agreement as to the timing of performance.  Cuker points out that although the SOW simply states that Cuker must "make the best possible effort to meet the timeline," (Doc. 124-7, p. 14, § VI), several Walmart employees testified in their depositions that they believed the SOW's timeline presented hard deadlines, *see, e.g.* Doc. 124-8, pp. 63–64, lines 243:3–246:5; Doc. 124-9, p. 57, lines 216:7–216:20; Doc. 124-25, pp. 34–35, lines 125:25–128:7; Doc. 124-26, p. 41, lines 153:8–153:19.  But as this Court explained above, it must "use an objective test for determining whether there was mutual assent without consideration of the parties' subjective opinions," *FutureFuel Chem. Co.*, 756 F.3d at 646, and to this Court's mind, a contractual obligation to "make the best possible effort" is simply nothing more and nothing less than a contractual obligation to "make the best possible effort."  This Court is unaware of any Arkansas cases holding that "best efforts" provisions are unenforceable for vagueness or ambiguity, and recently

had occasion to observe in a different case concerning New York[1] contract law that "whether such [an] obligation has been fulfilled will almost invariably . . . involve a question of fact." *Active Marketing Grp., Inc. v. EB Brands Holdings, Inc.*, 2016 WL 6090959, at *3 (W.D. Ark. Oct. 17, 2016) (quoting *Kroboth v. Brent*, 215 A.D.2d 813, 814 (N.Y. Sup. Ct., App. Div., 3d Dept. 1995)).

Finally, Cuker argues that the contract also lacked mutual agreement as to the timing of payments.  Again, Cuker points to different subjective interpretations by the parties of the SOW's requirements that "Walmart will provide feedback and approvals as required during every milestone," (Doc. 124-7, p. 14, § VI), and that "[a]ll invoices for fees and expenses are payable 45 days after receipt of invoice," *id.* at p. 15, § X.A.  But again, the fact that the parties disagree on how to properly interpret these provisions does not mean the parties did not agree to be bound by them, and whatever ambiguities or vagaries they might contain are not of the degree that would render it impossible for this Court to interpret them in accordance with standard rules of contractual construction.

The instant contract is hardly a model of clarity.  But while the contract, and the ensuing litigation, may be an object lesson in the perils of taking contractual shortcuts to speed up business negotiations, it is not unsalvageable.  Accordingly, Cuker's Motion for Summary Judgment is **DENIED**, and Walmart's Motion for Summary Judgment is **GRANTED** with respect to Count One of Cuker's Amended Counterclaim, which is **DISMISSED WITH PREJUDICE**.

---

[1] The Court is aware, of course, that the instant case concerns Arkansas law rather than New York law.

### B. Count Two of Counterclaim: Fraudulent Inducement

Count Two of Cuker's Amended Counterclaim alleges that Walmart fraudulently induced Cuker to enter into the instant contract with Walmart.[2]  Walmart has moved for summary judgment on this Count.   To prove the tort of fraudulent inducement under Arkansas law, Cuker must prove each of the following five elements: (1) that Walmart made a false representation of material fact; (2) that Walmart knew that the representation was false or that there was insufficient evidence upon which to make the representation; (3) that Walmart intended to induce Cuker to enter into the contract in reliance on the representation; (4) that Cuker justifiably relied upon the representation; and (5) that Cuker suffered damage as a result of the false representation.  *See Grand Valley Ridge, LLC v. Metro. Nat'l Bank*, 2012 Ark. 121, at *15, 388 S.W.3d 24; *Wal-Mart Stores, Inc. v. Coughlin*, 369 Ark. 365, 375 (2007).  When the proof of a claim for fraudulent inducement would alter or contradict the written terms of a contract, the party bringing the claim bears the burden of proving it by clear and convincing evidence; otherwise, the burden is merely by the preponderance of the evidence.  *See Beatty v. Haggard*, 87 Ark. App. 75, 83–84, 184 S.W.3d 479 (2004).  Cuker bases its claim for fraudulent inducement on four alleged false representations made to it by Walmart: (1) that Walmart wanted the "bare minimum" from Cuker necessary to make the ASDA website responsive; (2) that Walmart had the back-end infrastructure and system tools, expertise, and resources necessary to integrate the templates Cuker would provide into a responsive website; (3) that Walmart had no

---

[2] In addition to claiming that Walmart's fraudulent inducement entitles Cuker to recover consequential and punitive damages, *see* Doc. 61-1, p. 26, ¶¶ 63–64, Cuker has also asserted fraudulent inducement as an affirmative defense to Walmart's contractual claims against it, *see id.* at p. 10, ¶ 52.

third-party consultants working on its responsive website project; and (4) that the contract was prepared by a third party who had previously done work for Walmart and had already been approved by Walmart's legal department.

Walmart makes three general arguments in favor of summary judgment on this Count. The first argument is that "Cuker cannot produce any written evidence of any of the alleged representations." (Doc. 87-1, p. 44). The second argument is that even if these representations were made, they were not factual misrepresentations, but rather mere statements of opinion or "puffery." *See, e.g.*, *Grendell v. Kiehl*, 291 Ark. 228, 231, 723 S.W.2d 830 (1987). And the third argument is that these representations, even if made and even if false, were so immaterial or so inconsistent with the terms of the contract itself that Cuker would not have been justified in relying on them.

With regard to Walmart's first argument, the Court is not aware of any requirement that false representations be made in writing in order for a claim of fraudulent inducement to be actionable; and as a matter of common sense, it would be a very strange rule to hold fraudsters accountable only when they sign and date their lies. Proof can be made by many means, and Cuker has provided evidence in the form of deposition testimony that the first, third, and fourth of these statements were made to Cuker representatives by Walmart representatives during contract negotiations.[3] *See* Doc. 108-2, pp. 169–70, lines 111:10–112:2 (bare minimum); Doc. 108-2, p. 187, lines 210:4–210:9 (third-party

---

[3] At oral argument on the instant motions, Walmart indicated that these statements might be hearsay. The Court disagrees. Setting aside whether such statements might constitute non-hearsay opposing-party-statements under Fed. R. Evid. 801(d)(2), for an out-of-court statement to be hearsay, it must be offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). Cuker, of course, is doing precisely the opposite; it contends that these out-of-court statements were *false*.

consultants); Doc. 108-2, p. 188, lines 212:10–212:22 (preparation of contract by third-party vendor). However, Cuker has not directed the Court's attention to any evidence in the record, whether in writing, deposition testimony, or otherwise, that the second representation (about the quality of Walmart's back-end infrastructure, etc.) was ever made. Therefore, this alleged second representation is an insufficient basis for Cuker's fraudulent inducement claim.

Walmart's second and third arguments are a bit more nuanced, and require individualized consideration with respect to each remaining alleged false representation. Beginning with the representation that Walmart had no third-party consultants working on its responsive website project, Walmart points to the language of the contract itself as evidence that Cuker would not have been justified in relying on any such representation as a means of protecting its trade secrets. In pertinent part, the contract states: (1) that Cuker grants Walmart a license to use, distribute, etc. any of Cuker's intellectual property which is included in, or necessary for the use of, Cuker's "Deliverables" to Walmart, *see* Doc. 124-7, p. 3, § 3(c); and (2) that any other confidential information disclosed by one party to the other may only be disclosed to "employees, agents or contractors that need to know the information pursuant to this Agreement and who are required . . . to maintain the confidentiality of" such information, *see id.* at p. 3, § 4(a). In response, Cuker points to evidence that Walmart's representation regarding the absence of third-party consultants was false, *see* Doc. 108-2, p. 286, lines 61:14–61:25, but Cuker does not point to any evidence that it actually relied on the representation. Indeed, the only pertinent statement on this point that the Court has found in the evidentiary record is Cuker employee Kristopher Nicolls's response of "I don't know" when asked whether this

representation was "important to Mr. Atalla and Cuker." *See id.* at p. 187, lines 210:10–210:11.   Therefore, this representation is an insufficient basis for Cuker's fraudulent inducement claim.

Turning to the representation that the contract was prepared by a third party who had previously done work for Walmart, Walmart argues that any such representation "would be wholly immaterial" because "[t]he contract speaks for itself." (Doc. 87-1, p. 49). The Court agrees.   "[I]f a person signs a document, he or she is bound under the law to know the contents of the document.   Further, one who signs a contract, after an opportunity to examine it, cannot be heard to say that he or she did not know what it contained." *Neill v. Nationwide Mut. Fire Ins. Co.*, 355 Ark. 474, 479, 139 S.W.3d 484 (2003) (internal citations omitted).   It would not have been reasonable for Cuker to assume that simply because some other third-party contractors found similar contractual terms appropriate for their own needs, such contractual terms would be appropriate for Cuker's needs.   Furthermore, as with the other representation regarding third-party consultants, Cuker has provided no evidence that it actually relied on this representation.[4] Therefore, this representation is also an insufficient basis for Cuker's fraudulent inducement claim.

Finally, with regard to the "bare minimum" representation, Walmart argues that the contract itself requires much more than the "bare minimum," by pointing to the express requirement that Cuker "develop a responsive front-end by adding to the existing front-end code on all of the page templates defined in the scope," and emphasizing the word

---

[4] Significantly, the contract states that it should be interpreted "without regard to any presumption or rule of law requiring its construction against the Party drafting any part of this Agreement."  (Doc. 124-7, p. 7, § 14).

"all." *See* Doc. 87-1, p. 44. But that word "all" is modified by the words "templates defined in the scope," and the Court has already observed in the preceding section of this Opinion and Order that the scope of work is categorically limited to "the design of responsive desktop, tablet, and smartphone layouts for home page, navigation, 10 page templates, and responsive template guide."

Cuker's CEO, Aaron Cuker, testified in his deposition that the Walmart representative with whom he met to initiate negotiations, Alex Alexander, told Mr. Cuker that Walmart did not have the in-house expertise to begin making the ASDA website responsive itself, and that he lacked the budget to pay Cuker to do the entire job for Walmart; accordingly, Mr. Alexander told Mr. Cuker that he simply wanted Cuker to "help us just get the core shopper journey responsive," and then to let Walmart "handle the rest later." *See* Doc. 180-2, at pp. 160–61, lines 91:8–92:14. Mr. Cuker testified further that *Mr. Cuker* wrote most of the contract language in the SOW's site map, and that this language was "based upon [Walmart's] request for the bare minimum that we could do to help them to take their website responsive." *Id.* at pp. 169–70, lines 111:10–112:2.

However, on January 24, 2014, (six day prior to executing the contract), Walmart employee Susie Spencer emailed Walmart employee Debasish Bhattacharjee and Mr. Alexander, stating that she was concerned that the SOW did "not sound sufficient to cover the entire browse journey as discussed on the call"; apparently two hours later, Mr. Alexander sent an email to Mr. Bhattacharjee alone, saying with apparent reference to Ms. Spencer's concerns, "I have a plan, will ring you[.] We need to get round this." *See* Doc. 124-11, pp. 2–3. Six days later, Ms. Spencer again emailed Mr. Bhattacharjee, stating that she was "concerned about the content under section 'K: site map,'" because

among other problems, "sections [are] missing" from the site map.  (Doc. 121-4, p. 3).

This time, Mr. Bhattacharjee forwarded Ms. Spencer's concerns to Kristopher Nicolls at

Cuker, and proposed removing language from the contract's "site map" section which

stated "If new components are put in the below site map during the design and planning

phase it will require a PCR"; Mr. Battacharjee explained to Mr. Nicolls that "if we say

anything over and above (whatever is under those sections as defined) needs a PCR –

then we'd need to go comb through our entire site, come up with a very specific list to be

included under those sections.  An exercise that is painful for Susie and team, and would

simply delay the process."  *See id.* at 2–3.  Mr. Nicolls appears to have never responded,

and the PCR language came out of the "site map" section.  But despite this removal, and

as already noted in the preceding section of this Order, the final Agreement governing the

final SOW nevertheless *expressly* stated that the scope of work could not be changed

except through the formal PCR process, and the final SOW capped the scope of work at

the "design of . . . layouts for home page, navigation, 10 page templates, and responsive

template guide."  *See* 124-7, p. 2, § 1.

Only four days after Cuker signed the contract, when the project had barely even

launched, Mr. Battacharjee stated in an email to Mr. Alexander that "[w]e need to keep a

**very tight leash**" on Cuker, *see* Doc. 124-2, p. 3 (emphasis in original), that Walmart

should "demand precise planning, timelines from Cuker by this week," *id.*, "[g]et

Susie/Mike *to nod on scope* during their visit" to Cuker's headquarters, *see id.* (emphasis

added), and to "approach this in a war footing," *id.*  Mr. Alexander responded the same

day with "Agreed[.]  Let's do it[.]  We need victoria on war footing[.]"  *Id.* at 2–3.  Three

and a half weeks later, Mr. Cuker emailed Mr. Alexander, stating "I wanted [to] reach out

because your team is asking us about adding more sections to phase 1 than were originally discussed. I would like to have a quick conversation on Monday if you are available . . . ." (Doc. 124-13, p. 3). Mr. Alexander forwarded the email internally with a request for an explanation, to which Ms. Spencer responded, concluding with the statement that "[t]his goes back to the concerns I had surrounding the SoW which did not accurately call out the pages, templates and flows that would be needed for launch." *Id.*

A fact-finder could reasonably conclude from all of this that when Cuker signed the contract, Cuker believed—and Cuker believed that Walmart believed—that Cuker was contracting to perform no more work than was necessary for the "design of . . . layouts for home page, navigation, 10 page templates, and responsive template guide." A fact-finder could also simultaneously conclude from all of this that Walmart actually intended to demand more work than this from Cuker under the contract.[5] It is possible that a fact-finder could reach these two conclusions and decide that these mismatched intentions were the result of nothing more than a simple, albeit very important and unfortunate, misunderstanding or miscommunication between the parties.[6] However, when the record is viewed in the light most favorable to Cuker, it is also possible for a fact-finder to reasonably infer from these facts that Walmart intentionally led Cuker to believe that Cuker was contracting to perform no more work than was necessary for the "design of

---

[5] If this was in fact Walmart's intention, then Walmart's intention was not consistent with this Court's interpretation of the contract's scope of work, as explained in the preceding section of this Opinion and Order.

[6] If so, this would not make the contract void for lack of mutual assent. As discussed in the preceding section of this Opinion and Order, whatever the parties' different understandings of the contract may have been at the time it was executed, the contract means what it says and is not so vague or ambiguous as to prevent this Court from interpreting it.

. . . layouts for home page, navigation, 10 page templates, and responsive template guide," while secretly intending to extract far more work than this from Cuker once all parties' signatures were on the contract, locking Cuker into a fixed fee that was far lower than what it would have agreed to if it had not been led to believe that it was only expected to provide the "bare minimum" necessary to enable Walmart "handle the rest later." Viewing the record in this light, Walmart's "bare minimum" representation was neither immaterial to nor inconsistent with Cuker's understanding of the terms to which it was contracting, but rather a factual representation of central importance to Cuker's decision to enter into the contract at the agreed-upon price.  And the very position presently taken by Walmart in this lawsuit—that its own interpretation of the contract's scope of work was (and is) far more extensive than Cuker's "bare minimum" understanding—would permit a very reasonable inference that the "bare minimum" representation was a false one, in the sense that it misrepresented Walmart's concealed intentions.

But even if all of the foregoing were found to be true, it would simply mean that regardless of however malicious or devious Walmart's intentions or conduct may have been, at the end of the day *Cuker intentionally and successfully contracted to perform what it understood to be Walmart's requested "bare minimum."*  At the risk of belaboring the point: the contract's scope of work is categorically limited to "the design of responsive desktop, tablet, and smartphone layouts for home page, navigation, 10 page templates, and responsive template guide."  This is how Mr. Cuker drafted it, this is how Cuker has consistently understood it, and this is how the Court now interprets the plain language within its four corners.  Even viewing the record in the light most favorable to Cuker, it can only be said that while Walmart may have deceived itself as to how much work the

contract would permit it to obtain from Cuker, it did not so deceive Cuker.  Therefore, Walmart's Motion for Summary Judgment is **GRANTED** with respect to Count Two of Cuker's Amended Counterclaim, which is **DISMISSED WITH PREJUDICE**.

### C.  Count Three of Counterclaim: Misappropriation of Trade Secrets

Count Three of Cuker's Amended Counterclaim alleges that Walmart misappropriated Cuker's trade secrets.  The Arkansas Trade Secrets Act ("ATSA") defines "misappropriation" as, *inter alia*, acquisition by someone "who knows or has reason to know that the trade secret was acquired by improper means," or "disclosure or use . . . without express or implied consent" by someone who at the time of disclosure or use "knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  Ark. Code Ann. § 4-75-601(2).  The ATSA defines "improper means" to include things such as "theft, . . . misrepresentation, . . . or inducement of a breach of a duty to maintain secrecy." *Id.* at § 4-75-601(1).  Walmart has moved for summary judgment on this Count, advancing two arguments in support: first, that the contract bars Cuker's trade secrets claim, and second, that Walmart did not use "improper means" to acquire Cuker's trade secrets because Cuker voluntarily disclosed its trade secrets to Walmart.

Both of these arguments, at least as structured in Walmart's instant Motion, are foreclosed by this Court's prior ruling, in its Opinion and Order dated December 12, 2014, that "the Contract does not bar ATSA claims regarding trade secrets that are not 'Work Product' as that term is defined in section 3(a) in the Contract."  (Doc. 23, p. 6).  As the Court explained at that time:

> [T]he contract states that "Consultant may not seek . . . Intellectual Property Rights protection for any Work Product," (Doc. 4-1, § 3(b)), and defines

"Intellectual Property Rights" as including trade secrets, *id.* at § 3(e). However, elsewhere the Contract contains a mutual acknowledgement that "either Party may receive . . . Confidential Information," *id.* at § 4(a), and defines "Confidential Information" to include "any trade secret," *id.* at § 4(b)(iv).  Additionally, the Contract imposes a duty on any receiving party to "keep . . . any trade secret of Disclosing Party confidential as long as that information remains a trade secret."  *Id.* at § 4(a)(ii).

*Id.*

The Court was of the view then, and remains so now, that the only way to give meaningful effect to *both* of these sections in the contract is to make the rather obvious interpretation that the contract explicitly anticipates that Cuker might, for whatever reason, disclose trade secrets to Walmart which are not "work product" as defined in the contract, and that in such event, Walmart would have a contractual duty not to disclose those trade secrets to third parties without Cuker's consent.  This is significant because it means that if Walmart acquired any of Cuker's non-work-product trade secrets, Walmart's unauthorized sharing of such trade secrets with third parties would constitute trade-secret misappropriation *regardless* of whether those trade secrets were acquired through improper means.   *See* Ark. Code Ann. § 4-75-601(2)(B)(ii)(b).   Cuker alleges in its Amended Counterclaim that "[n]ot only did Walmart misappropriate Cuker's trade secrets through . . . improper means . . ., it also knowingly and intentionally provided this information to Cuker's competitors with whom Walmart had pre-existing relationships, who in turn have used and continue to use Cuker's trade secrets to develop and design responsive websites for Walmart." (Doc. 61-1, p. 28, ¶ 69).  Yet Walmart's instant Motion is completely silent on the question of whether Cuker's trade secrets were distributed to third parties without authorization, focusing instead solely on the question of whether

Walmart used improper means to acquire Cuker's trade secrets. This silence alone would be enough to deny Walmart's Motion as to Cuker's trade secrets claim.[7]

But even on the issue of whether Walmart used "improper means" to acquire Cuker's trade secrets, material factual disputes exist. A threshold problem is that Walmart fails to identify any particular trade secret and explain why or how it is "work product" so as to activate the contractual bar on trade-secret claims in the first place. It certainly is not the Court's duty to perform this task in Walmart's stead.

Aside from Walmart's contractual-shield argument, Walmart merely asserts without further elaboration that it could not have been "improper means" for Walmart to have "pressured and bullied Cuker's technical team to provide Cuker's confidential and proprietary [information], which were not within the scope of the Contract, without informing Cuker's management," Doc. 61-1, p. 28, ¶ 69, because "[a]s it turns out, 'Cuker's technical team' is not a lowly Cuker employee, but rather Cuker's Chief Technology Officer, Mr. [Nikolaj] Baer," Doc. 87-1, p. 51. The only evidence Walmart points to in support of this contention is potentially hearsay within hearsay: deposition testimony of Cuker President Adel Atalla that Mr. Cuker told Mr. Atalla that Mr. Baer told Mr. Cuker that Mr. Baer "and potentially others" had given Cuker's trade secrets to Walmart, and that Mr. Baer "was very, very frightened." *See* Doc. 86-11, pp. 165–66, lines 39:15–40:18. But assuming *arguendo* the admissibility of this evidence as opposing-party-statements under Fed. R. Evid. 801(d)(2), it does nothing to establish that

---

[7] In fairness to Walmart, discovery on this discrete issue has not yet ended even as of today. But in fairness to Cuker, Walmart is the party that chose to move for summary judgment on this claim more than four months ahead of its deadline to do so, *see* Doc. 71, p. 3, and only two and a half weeks after Cuker had switched counsel, *see* Doc. 83.

Mr. Baer and his technical team were not pressured or bullied to give Walmart non-work-product trade secrets; if anything, it would tend to indicate the opposite.  And indeed, other evidence in the record indicates, at a minimum, that before the companies parted ways, Mr. Cuker had already become extremely alarmed by being cut out of the loop on requests from Walmart to Cuker's technical team for work that Mr. Cuker believed to be inconsistent with the parties' contract.  *See, e.g.*, Doc. 86-11, p. 585 (May 8, 2014 email from Mr. Cuker to Mr. Atalla) ("HI ADEL, ALL OF THESE MUST GO THROUGH ME!!!!!!!! VICTORIA[8] IS TRYING TO WORK AROUND THE PROCESS.  I AM TRYING TO CONTROL THIS.  EVERYTHING MUST GO THROUGH ME!!!!!!!!!!!!!!!!!!!  Aaron").  The Court simply cannot conclude at this time that there is no factual dispute as to whether Walmart used improper means to acquire any of Cuker's trade secrets.  Walmart's Motion for Summary Judgment is therefore **DENIED** with respect to Count Three of Cuker's Amended Counterclaim.

### D.  Count Four of Counterclaim: Breach of Contract

Count Four of Cuker's Amended Counterclaim alleges that Walmart breached its contract by, "[a]mong other things," having:

> failed to provide a functional back-end infrastructure and a competent system to integrate the deliverables Cuker was required to provide to Walmart under the Contract on a responsive website, failed to provide a development site on which the deliverables could be developed and tested, failed to provide prompt feedback and approval of deliverables, failed to provide a testing site for the deliverables, failed to limit its revisions of the deliverables in accordance with the Contract, and failed to pay Cuker a down payment and make other payments as set forth in the Contract.

(Doc. 61-1, p. 29, ¶ 76).

---

[8] Presumably, she of the aforementioned "war footing."  *See* Subsection III.B, *supra*.

20

Cuker further alleges in Count Four that:

> Walmart also breached confidentiality provisions of the Contract by obtaining through improper means Cuker's confidential and proprietary information that fell far outside the scope of what Cuker was required to provide to Walmart, by using and disclosing that information for Walmart's benefit and to Cuker's detriment in violation of the terms of the Contract.

*Id.* at ¶ 77.

Walmart moved for summary judgment on this Count.  But on December 15, 2016, during oral argument on summary judgment, counsel for Walmart indicated that he wished to withdraw Walmart's summary-judgment motion as to this particular Count, because "both parties have alleged that the other party didn't perform, and [Walmart] is not going to take up the Court's time arguing otherwise."  The Court permitted withdrawal of the argument from the bench.  However, it has subsequently occurred to the Court that it might have misunderstood counsel's intent, and that he only meant to "reserve" the argument because of time constraints, and did not wish to offer any oral argument on this particular portion of Walmart's motion.  Moreover, as will be explained shortly below, Walmart's motion with respect to Count Four is not merely a contention that there are no material disputed facts as to this Count.  Out of an abundance of caution, then, the Court will proceed to rule on the parties' summary-judgment arguments as to Count 4 of Cuker's Amended Counterclaim, because the argument was reserved, and because narrowing the issues now will aid the parties' presentation of evidence at trial.

Walmart initially argued there is no material factual dispute the failures never occurred, while Cuker argued in its Response that there is.  However, in its Reply, Walmart contended for the first time that Cuker's allegations in Count Four, even if true, are essentially an affirmative defense of "frustration of purpose" that has been mistakenly

designated as a counterclaim, and that the Court should treat it as such pursuant to Fed. R. Civ. P. 8(c)(2). Cuker never sought leave to file a sur-reply in order to respond to this new argument. The Court believes Walmart's misdesignation argument has some merit, though not to the extent that Walmart contends.

The parties agree that Walmart has not paid Cuker the final $57,629 of the fees for which Cuker contracted; but they disagree on whether Cuker has fulfilled its obligations under the contract, making it entitled to payment of the outstanding sum. Cuker contends it has fulfilled its contractual obligations, and seeks to recover this unpaid sum—perhaps offset by $27,000 for reasons that are not germane to this motion, *see* Doc. 138-1, p. 22—as well as further compensation for additional work it performed that it contends is outside the contract's scope of work. If Cuker has in fact fulfilled its obligations under the contract, then Cuker is entitled to full compensation from Walmart under the terms of the contract, regardless of whether the allegations in paragraph 76 are true. On the other hand, if Cuker has *not* fulfilled its obligations under the contract, then the allegations in paragraph 76, if true, could support a wide variety of the affirmative defenses which Cuker has already explicitly asserted elsewhere in its Amended Answer, which include impossibility, frustration of purpose, and excuse by breach. *See, e.g.*, Doc. 61-1, p. 10–11, ¶¶ 54–60. Thus, the allegations in paragraph 76 appear to the Court to be entirely in the nature of an affirmative defense and ultimately immaterial to the relief that Cuker is seeking in Count Four of its Amended Counterclaim. Therefore, the Court will grant Walmart's request to redesignate Count Four as affirmative defenses, to the extent that this request pertains to the allegations in paragraph 76; and since Walmart

22

has not moved for summary judgment on any of Cuker's affirmative defenses, the Court will not concern itself any further in the instant Order with that paragraph.

However, the same cannot be said for the allegations in paragraph 77, which clearly contemplate a very different sort of breach, analogous to Cuker's claim in Count Three for misappropriation of trade secrets. If proven, the facts in paragraph 77 may support some of Cuker's affirmative defenses, but they could also potentially entitle Cuker to the recovery of damages beyond mere unpaid compensation for work.[9] Thus, it would be improper for the Court to simply redesignate this portion of Count Four as an affirmative defense; the issue of whether there is a material dispute of fact as to the allegations in paragraph 77 must be reached.

Walmart makes two arguments for summary judgment with regard to the allegations in paragraph 77. The first is simply to repeat that "Walmart used no improper means to obtain information, confidential and proprietary or otherwise, from Cuker." (Doc. 87-1, p. 57). This argument is unavailing here for the same reason it fails as to Cuker's claim for trade-secret misappropriation. *See* Subsection III.C, *supra*.

Walmart's second argument regarding paragraph 77 is that Cuker's claim for breach of contract is barred by Cuker's prior material nonperformance. *Id.* Specifically, Walmart contends there is no material dispute that "Cuker refused to deliver the final code drop by May 29," and that "Cuker was repeatedly late in delivering code and repeatedly raised unnecessary squabbles about the scope of the SOW." *Id.* The Court is not aware

---

[9] Although the ATSA "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret," Ark. Code Ann. § 4-75-602(a), it "does not affect . . . [c]ontractual or other civil liability or relief that is not based upon misappropriation of a trade secret," *id.* at § 4-75-602(b)(1).

of any provision in the contract that prohibits the raising of unnecessary squabbles about anything.   As for the timeliness of Cuker's code drops, the Court has already observed earlier in this Opinion and Order that the contract simply required Cuker to make its "best possible efforts" to meet the code-drop deadlines, and that whether best efforts were used "almost invariably . . . involve[s] a question of fact."   *See* Section III.A, *supra*.   Here, Walmart has not met its burden under Rule 56(c) of pointing to any evidence that Cuker failed to use its best possible efforts to meet these deadlines.   Therefore, with respect to Count Four of Cuker's Amended Counterclaim, Walmart's Motion for Summary Judgment is **GRANTED** to the extent that Cuker's allegations in paragraph 76 of that Count are redesignated and will be tried as affirmative defenses, but otherwise **DENIED**.

## E.  Count Five of Counterclaim: Unjust Enrichment

Count Five of Cuker's Amended Counterclaim seeks to recover unjust enrichment from Walmart for the work which Cuker contends was outside the scope of the contract. Walmart has moved for summary judgment on this Count, and offers three arguments in support of its motion.

First, Walmart argues that "[t]he concept of unjust enrichment has no application when an express written contract exists."   (Doc. 87-1, p. 58) (quoting *Servewell Plumbing, LLC v. Summit Contractors, Inc.*, 362 Ark. 598, 612, 210 S.W.3d 101 (2005)).   This Court already rejected this argument on December 12, 2014, when it observed that "while this is a correct statement of the general rule, it is not the end of the matter.   Arkansas law permits a number of exceptions to this rule, including 'where the contract fails on some basis, or does not fully address a subject, or *disputed performance is compelled under protest*.'"   *See* Doc. 23, p. 4 (quoting *QHG of Springdale, Inc. v. Archer*, 2009 Ark. App.

692, at *11) (emphasis added in original). Here, the record reveals ample evidence that from the very beginning of the parties' performance under the contract all the way to their parting of ways under threats of litigation, Cuker consistently protested that Walmart was demanding services that went well beyond the contractual scope of work for designing "responsive desktop, tablet, and smartphone layouts for home page, navigation, 10 page templates, and responsive template guide," and that Cuker's delivery of such work was accompanied by explicit and repeated reservations that it was out of contractual scope. *See, e.g.*, Doc. 124-13, p. 3; Doc. 86-11, pp. 592–607. A fact-finder could easily infer from this that if Cuker delivered any out-of-scope work to Walmart, such delivery was a disputed performance that was compelled under protest.

Walmart's second argument is that the contract entitles Walmart to exclusive legal title in all deliverables provided by Cuker, period. The Court disagrees. As previously explained, the Agreement explicitly permits the SOW to circumscribe the universe of "work product" to which this vesting of exclusive property rights in Walmart applies, *see* Doc. 124-7, p. 2, § 3(a) ("[e]xcept as . . . otherwise specified in a Statement of Work . . ."), and the SOW explicitly states that Cuker's consideration for "[t]he price" is "the design of responsive desktop, tablet, and smartphone layouts for home page, navigation, 10 page templates, and responsive template guide," *see id.* at p. 11, § III.k. Whether Cuker is entitled to recover unjust enrichment from a particular item will depend in part on whether that item is inside or outside the universe of "design[s] of responsive desktop, tablet, and smartphone layouts for home page, navigation, 10 page templates, and responsive template guide," for which Cuker negotiated a contractual fee of $577,719.

Finally, Walmart argues that "Cuker cannot prove the 'reasonable value' of what it claims was out of scope," which "is an essential element of its claim." (Doc. 87-1, p. 60). But Cuker has provided an expert report by Dr. Patrick Kennedy, (Doc. 138-1, pp. 19–42), which purports to do this very thing and which contains opinions that would be appropriate for a fact-finder to consider when determining the amount, if any, of Cuker's damages. *See* Doc. 173. Walmart's Motion for Summary Judgment is therefore **DENIED** with respect to Count Five of Cuker's Amended Counterclaim.

### F. Count Six of Counterclaim: Injunctive Relief

Count Six of Cuker's Amended Counterclaim seeks injunctive relief under the ATSA, as authorized by Ark. Code Ann. § 4-75-604, which states that "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined." Walmart has moved for summary judgment on this Count, under the sole theory that Cuker's trade-secret misappropriation claim in Count Three fails as a matter of law. Because the Court has already ruled that material factual disputes remain as to Count Three, Walmart's Motion for Summary Judgment is **DENIED** with respect to Count Six.

### IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Cuker Interactive, LLC's Motion for Partial Summary Judgment (Doc. 121) is **DENIED**, and Plaintiff Wal-Mart Stores, Inc.'s Motion for Summary Judgment as to Counterclaim (Doc. 86) is **GRANTED IN PART AND DENIED IN PART** as follows: Counts One and Two of Cuker's Amended Counterclaim (Doc. 61) are **DISMISSED WITH PREJUDICE**, and the allegations in paragraph 76 of Cuker's Amended Counterclaim are redesignated as affirmative defenses.

**IT IS SO ORDERED** on this _22nd_ day of December, 2016.

                                          _____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE