### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

**WAL-MART STORES, INC.**                      **PLAINTIFF/ COUNTER-DEFENDANT**

**V.**              **CASE NO. 5:14-CV-5262**

**CUKER INTERACTIVE, LLC**            **DEFENDANT/ COUNTER-CLAIMANT**

### MEMORANDUM OPINION AND ORDER

Currently before the Court are:

- Plaintiff Wal-Mart Stores, Inc.'s ("Walmart") Motion in Limine to Preclude Improper Statistical Expert Testimony (Doc. 306) and Memorandum in Support (Doc. 307-1), and Defendant Cuker Interactive, LLC's ("Cuker") Brief in Opposition (Doc. 365);

- Walmart's Motion in Limine to Exclude Evidence of Cuker's Damages in Excess of Contract Price (Doc. 257) and Memorandum in Support (Doc. 258-1); Cuker's Opposition (Doc. 262); and Walmart's Reply in Support (Doc. 270-1); and

- Cuker's Motion in Limine to Exclude Evidence and Argument that the Scope of Cuker's Services under the Contract Exceeds the Scope Defined by the Court (Doc. 323) and Brief in Support (Doc. 324), and Walmart's Memorandum in Opposition (Doc. 351-8).

For the reasons given below, Walmart's motion regarding statistical testimony is **GRANTED**; Walmart's motion regarding damages limitation is **DENIED**; and Cuker's motion regarding the contractual scope is **GRANTED**.

## I. WALMART'S MOTION REGARDING STATISTICAL TESTIMONY (Doc. 306)

Walmart retained Cuker to help make Walmart's ASDA Groceries website responsive.  The parties have counterclaims against each other for alleged breaches of this contract, but Cuker also has asserted claims against Walmart for unjust enrichment and misappropriation of Cuker's trade secrets.  Among the incidents on which these latter two claims are premised, are allegations that Walmart improperly shared Cuker-authored code from the ASDA Groceries website with third-party vendors who were involved in making responsive one of Walmart's other groceries websites, called "Walmart2Go."

Cuker's computer science expert, William C. "Chuck" Easttom, has submitted a supplemental expert report in support of Cuker's trade-secret claims against Walmart.  *See* Doc. 365-1.  In paragraphs 66–76 and 205 of that supplemental report, Mr. Easttom observes that there are many instances in which identical variable names are used in the ASDA and Walmart2Go code, and he employs a statistical technique known as the "product rule" to determine the likelihood that this occurred by coincidence.  The product rule "states that the probability of the joint occurrence of a number of *mutually independent* events is equal to the product of the individual probabilities that each of the events will occur."  *People v. Collins*, 68 Cal. 2d 319, 325 (1968) (emphasis in original).  Mr. Easttom gives an example of five different possible names for one variable: "AisleID, aisle_ID, aisleIdentifier, aisle_number, [and] aisle_Num," *see* Doc. 365-1, pp. 36–37, ¶ 66, and although he contends that "[t]here are approximately 15 to 20 logical variations for any given variable," *id.*, he assumes for purposes of his statistical exercise that there are only five, *see id.* at pp. 37–38, ¶ 69.  He then considers 12 instances of matching variable names (though he asserts that he actually found many more than 12 such

2

instances), *see id.* at p. 38, ¶ 70, and by finding the twelfth power of 0.2, concludes that there is only a 0.0000004096% chance (1 in 244,140,625) that all 12 variable names were identical merely by coincidence, *see id.* at ¶ 71. He then opines that this is less likely that the odds of winning the California lottery while buying only 40 tickets, having 20 consecutive coin tosses turn up heads, winning an Olympic gold medal, being struck by lightning, becoming president, becoming an astronaut, or being sainted by the Catholic Church. *Id.*

Walmart has moved to exclude Mr. Easttom's opinions to the extent they are premised on his use of the product rule, on the grounds that his methodology is flawed, misleading, and unreliable. One such flaw, according to Walmart, is that Mr. Easttom has committed what is sometimes called "the prosecutor's fallacy," which occurs when one confuses the probability of a random match occurring with the probability that the match was not the result of a particular alleged cause. *Cf. McDaniel v. Brown*, 558 U.S. 120, 128 (2010) ("[I]f a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy."). Here, Mr. Easttom would be committing the prosecutor's fallacy if he inferred from the above analysis that there is only a 1 in 244,140,625 chance that Walmart2Go authors did not copy these variable names from ASDA code. A second, closely related criticism that Walmart makes of Mr. Easttom's methodology, is that he is fallaciously applying the product rule to events that might not be independent. (As noted above, the product rule only yields valid joint probabilities when applied to separate

3

events that are all mutually independent from each other.)  Finally, Walmart argues that

Mr. Easttom's unfavorable comparison of these odds to sensational events like winning

the lottery, being struck by lightning, being sainted, etc. are likely to inflame the jury and

compound the prejudicial effect of his purported errors.

The Court believes Walmart's concerns here are legitimate, and it shares them.

One especially salient fact illustrates why.  The Court anticipates that Walmart will present

testimony at trial that the Walmart2Go and ASDA websites shared a common code base

until Walmart2Go was forked from ASDA in 2009 or 2010.[1]  If that fact is true, then

regardless of when or by whom these variable names were authored, there is a very

significant likelihood that these naming events were not mutually independent.  Perhaps

the authors of the ASDA and Walmart2Go code both inherited many of the same

preexisting variable names.  Or perhaps they all independently authored many identical

variable names because they all attempted to conform with the same preexisting naming

conventions that they all observed within older pre-fork code.  But whatever the case may

actually be, the essential problem here is that not only does Mr. Easttom appear to have

assumed the mutual independence of these naming events, in the absence of any

---

[1] Presently this fact appears in the record only through the characterization that Walmart's computer science expert, Brad Ulrich, makes of what he was told by a man named Andrew Sondgeroth who has worked on the Walmart2Go code since 2013.  *See* Doc. 314-1, p. 14, ¶¶ 44, 45.  Offering this fact at trial in that manner may or may not constitute hearsay.  *See* Fed. R. Evid. 801(c), 802.  However, the Court has already ruled (in the context of a different motion) that it will permit Mr. Sondgeroth to offer direct testimony at trial, which obviates this concern.

evidence that such events were, in fact, independent; there also appears to be evidence that these events were *not* independent.[2]

None of this is to say that it is irrelevant that Mr. Easttom found so many instances of matching variable names, or that it was unwarranted for these matches to have aroused his suspicions that copying might have occurred, or that it would be unreasonable for him to conclude generally that it is very unlikely these matches were mere random coincidences. But the Court will **GRANT** Walmart's Motion in Limine to Preclude Improper Statistical Expert Testimony (Doc. 306) by restricting Mr. Easttom's testimony in the following very specific senses: (1) the Court will not permit Mr. Easttom, during his testimony at trial, to employ the product rule as done in paragraphs 66–76 or as implied in paragraph 205 of his supplemental report; (2) the Court will not permit Mr. Easttom to opine at trial that the probability of a random match between the code or design of Walmart2Go and ASDA equals the probability that Walmart2Go's code or design was not copied from ASDA's code or design; and (3) the Court will not permit Mr. Easttom to offer testimony at trial that compares the probability of random matches between Walmart2Go and ASDA with the probability of sensational events occurring, such as winning the lottery, being struck by lightning, or being sainted. The Court is excluding such testimony because the Court finds that its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury as described above. *See* Fed. R. Evid. 403.

---

[2] In fairness to Mr. Easttom, it seems very likely he was unaware that the Walmart2Go and ASDA websites ever shared a common code base. *See* n.1, *supra*.

## II. WALMART'S MOTION REGARDING DAMAGES LIMITATION (Doc. 257)

Section 9 of the Consulting Agreement between the parties in this case states, in all capital letters:

> **Limitation of Liability**. Under no circumstances is Walmart liable under any theory of tort, contract, strict liability or other legal or equitable theory for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages or the like, each of which is excluded by agreement of the parties regardless of whether damages were foreseeable or whether Walmart had been advised of the possibility of damages. Walmart's aggregate liability to consultant or any third party for any claims, losses, injuries, suits, demands, judgments, liabilities, costs, expenses or damages for any cause whatsoever (including, but not limited to, those arising out of or related to this Agreement), and regardless of the form of action or legal theory, must not exceed the total fees paid by Walmart under this Agreement. The limitations of liability reflect the allocation of risk between the parties. The limitations specified in this Section 9 survive and apply even if any limited remedy specified in this Agreement is found to have failed of its essential purpose.

(Doc. 124-7, p. 6, § 9). Walmart agreed in the Statement of Work to pay Cuker a total fee of $577,719, *see, e.g.*, *id.* at p. 17, § X, and Walmart has actually paid Cuker $520,090 under the Agreement, *see, e.g.*, Doc. 4, ¶ 36; Doc. 61-1, p. 9, ¶ 36.

Walmart invokes this limitation-of-liability clause and asks the Court to exclude under Fed. R. Evid. 403 "(1) any evidence of damages sought by Cuker that are non-compensatory in nature, and (2) any evidence of damages, costs, or expenses in excess of the contract price." (Doc. 257, ¶ 1). Walmart further asks the Court to instruct the jury under Fed. R. Evid. 105 "that § 9 of the Consulting Agreement between the parties applies to all of Cuker's claims and requested remedies." *Id.* at ¶ 2. Cuker opposes Walmart's motion on the grounds that Section 9 is an unenforceable exculpatory clause, and that even if it is enforceable it does not apply to Cuker's claims for unjust enrichment and trade-secret misappropriation.

"An exculpatory provision is one where a party seeks to absolve himself in advance of the consequences of his own negligence," and such provisions are generally disfavored under Arkansas law "due to the strong public policy of encouraging the exercise of care." *Ingersoll-Rand Co. v. El Dorado Chem. Co.*, 373 Ark. 226, 231–32 (2008) (internal quotation marks omitted). Arkansas courts apply two rules of construction to exculpatory clauses. "First, they are to be strictly construed against the party relying on them." *Id.* at 232. Second, to avoid liability for negligence, "the contract must at least clearly set out what negligent liability is to be avoided." *Id.* Furthermore, Arkansas courts "are not restricted to the literal language of the contract" when reviewing exculpatory clauses, and "will also consider the facts and circumstances surrounding the execution of the release in order to determine the intent of the parties." *Id.* An exculpatory clause *may* be enforced when each of the following three requirements is satisfied: "(1) when the party is knowledgeable of the potential liability that is released; (2) when the party is benefitting from the activity which may lead to the potential liability that is released; and (3) when the contract that contains the clause was fairly entered into." *See id.*

A few preliminary observations should be made here about the language and meaning of Section 9. First, the first sentence of Section 9 plainly states on its face that Walmart shall not be liable to Cuker under any theory whatsoever for any damages that are non-compensatory in nature. Second, the second sentence of Section 9, when read in conjunction with the first sentence, plainly states on its face that Walmart's *aggregate* liability to Cuker for any cause whatsoever, under any theory whatsoever including costs and expenses, shall not exceed the total fees that Walmart *paid* to Cuker under the Consulting Agreement. Here, as noted above, Walmart has paid Cuker $520,090 under

7

the Consulting Agreement. Thus, if one were to apply the plain language of Section 9 to the instant facts, then regardless of the causes or theories asserted, Walmart would not be liable to Cuker for any non-compensatory damages, and Cuker would not be permitted to recover an aggregate amount from Walmart in excess of $520,090, including costs and expenses.

But an interesting and rather bizarre implication of all this is that if, for example, Walmart had only actually paid Cuker one dollar out of the aforementioned $577,719 consulting fee, then the plain language of Section 9 would cap Walmart's aggregate liability to Cuker at one dollar rather than $520,090. In other words, under a literal reading of Section 9, Walmart had the authority to cap its potential liability to Cuker—for any cause whatsoever and under any theory whatsoever, including but not limited to contractual disputes—at whatever amount Walmart decided to pay Cuker. Or in yet other words, Section 9 gave Walmart the discretion to absolve itself of the consequences of its own negligence towards Cuker. Therefore, per the legal authority recited above, Section 9 is an exculpatory clause[3] which must be construed strictly against Walmart, as informed by the facts and circumstances surrounding its execution.

One important fact here is that "[t]here is no evidence in the record to suggest that" Cuker is an "unsophisticated business," or that the exculpatory clause was not executed

---

[3] Walmart argues that Section 9 is not an exculpatory clause at all, but rather simply a limitation on damages, and therefore not subject to "all of the policy considerations that demand greater scrutiny of exculpatory clauses." *See Erdman Co. v. Phoenix Land & Acquisition, LLC*, 2013 WL 3776405, at *1 (W.D. Ark. July 17, 2013). The Court would agree with Walmart on this point if, for example, Section 9 truly functioned only as a waiver of consequential damages. *See id.* But as explained above, that is not what Section 9 does; rather, it effectively gives Walmart the authority to decide whether it shall have *any liability at all* to Cuker, for *any type of claim whatsoever*, even with respect to *non-*consequential damages.

"in the course of businesses dealing at arm's length." *See Finagin v. Ark. Dev. Fin. Auth.*, 355 Ark. 440, 458 (2003). Indeed, as Walmart points out, Cuker proposed an exculpatory clause of its own during the early stages of the instant contract's negotiations. *See* Doc. 257-5, p. 6, § 9. The only reasonable conclusion from these circumstances is that at a minimum, Cuker understood that by signing the Consulting Agreement, it was agreeing under Section 9 that there would be *some* limit on Walmart's potential liability to Cuker, and that this limitation would apply, at the very minimum, to disputes "arising out of or related to this Agreement . . . regardless of the form of action or legal theory." *See* Doc. 124-7, p. 6, § 9; *cf. Plant v. Wilbur*, 345 Ark. 487, 495 (2001) (enforcing exculpatory clause that "contained certain key phrases in bold, such as 'releases,' 'discharges,' and, 'covenants not to sue,'" and that "specifically reference[d] releasing the [defendants] of claims for 'negligence' in three different passages"). And each of Cuker's claims in this case relates in some way to the Consulting Agreement. After all, Cuker claims that Walmart breached the contract by failing to fulfill its obligations under the Statement of Work that was attached to the Consulting Agreement; that Walmart extorted or bullied work from Cuker that was beyond the scope of work defined by that same Statement of Work; and that Walmart breached a duty of confidentiality with respect to Cuker's trade secrets that was imposed by Section 4 of the Consulting Agreement. Although each claim is different from the others in important respects, none of those claims can be fully understood or adjudicated without some reference to the Consulting Agreement.

However, the precise extent of the liability limitation to which Cuker believed itself to be agreeing is a trickier issue. Regardless of Section 9's literal meaning, the Court finds it inconceivable that Cuker, or even Walmart for that matter, believed itself to be

9

granting Walmart the discretion to cap its potential liability to Cuker at whatever amount Walmart decided to pay Cuker. Indeed, a promise of something in exchange for nothing is not even a contract at all. *See City of Dardanelle v. City of Russellville*, 372 Ark. 486, 491 (2008) ("One of the essential elements of a contract is mutuality of obligations, which means that an obligation must rest on each party to do or permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound. A contract, therefore, that leaves it entirely optional with one of the parties as to whether or not he will perform his promise would not be binding on the other." (internal quotation marks and citation omitted)). Far more likely, to the Court's mind, is that the parties believed themselves to be agreeing that Walmart's liability would be limited not by what it *paid* under the Agreement, but rather by what it *agreed to pay* under the Agreement, which was $577,719.

But the analysis does not end there. The Court also believes it is very significant that, as previously held:

> [W]hen the record is viewed in the light most favorable to Cuker, it is also possible for a fact-finder to reasonably infer . . . that Walmart intentionally led Cuker to believe that Cuker was contracting to perform no more work than was necessary for the "design of . . . layouts for home page, navigation, 10 page templates, and responsive template guide," while secretly intending to extract far more work than this from Cuker once all parties' signatures were on the contract, locking Cuker into a fixed fee that was far lower than what it would have agreed to if it had not been led to believe that it was only expected to provide the "bare minimum" necessary to enable Walmart [to] "handle the rest later."

(Doc. 197, pp. 15–16). This matters because an exculpatory clause is unenforceable if it was not entered into fairly. *See Ingersoll-Rand Co.*, 373 Ark. at 232. And although it is true that this Court awarded Walmart summary judgment on Cuker's claim for fraudulent inducement, that is simply because the Court found that "at the end of the day Cuker

intentionally and successfully contracted to perform what it understood to be Walmart's requested bare minimum." (Doc. 197, p. 16). It is one thing to find, as this Court has, that Cuker was not deceived into contracting to terms that it did not wish to adopt. But it is a very different thing to find that Cuker was not deceived about Walmart's alleged intention to obtain trade secrets and out-of-scope work from Cuker after the ink on the signature page was dry. This Court has never found the latter; to the contrary, it has stated that a reasonable jury could find that Cuker *was* so deceived. *See id.* at 15–16.

This ultimately boils down to what the Court believes is a rather common-sense principle: that to whatever extent Arkansas law favors a "strong public policy of encouraging the exercise of care," *Ingersoll-Rand Co.*, 373 Ark. at 232, it surely favors an even stronger public policy of encouraging parties not to intentionally harm each other. *Cf. Robinson Ins. & Real Estate Inc. v. S.W. Bell Tel. Co.*, 366 F. Supp. 307, 311 (W.D. Ark. 1973) ("As indicated in the decisions previously quoted, the contract limitation provision relied on by defendant cannot stand in the face of wilful [sic] and wanton misconduct or gross negligence."). If the jury finds that Walmart misappropriated Cuker's trade secrets, a finding will also be necessary as to whether that misappropriation was "willful and malicious." *See* Ark. Code Ann. § 4-75-607(3). Similarly, if the jury finds that Walmart was unjustly enriched, the Court will require the jury to make an additional finding on its verdict form as to whether Walmart intentionally demanded work from Cuker that Walmart believed to be outside the contract's scope of work. For either of these claims— trade-secret misappropriation or unjust enrichment—if there is ultimately a finding that Walmart acted willfully in the manner described above, then the Court will rule Section 9 unenforceable with respect to that claim. Accordingly, Walmart's Motion in Limine to

11

Exclude Evidence of Cuker's Damages in Excess of Contract Price (Doc. 257) will be **DENIED**. Walmart may renew its arguments on these issues at an appropriate time under Fed. R. Civ. P. 50.

### III. CUKER'S MOTION REGARDING CONTRACTUAL SCOPE (Doc. 323)

Cuker observes in this motion that the Court has previously defined the scope of the contract to be the "design of responsive desktop, tablet, and smartphone layouts for home page, navigation, 10 page templates, and responsive template guide," *see* Doc. 197, p. 16, and asks the Court to exclude evidence and argument from Walmart that the contractual scope of work exceeds this definition. Walmart acknowledges that the Court has thus defined the scope of work under the contract, but it also points out that the Court still has not defined the contractual terms "template" or "deliverable," which will in turn inform whether a particular item is "work product" for purposes of the license that Section 3(c) of the Consulting Agreement grants to Walmart for any of Cuker's intellectual property that is either made part of deliverables or required for the use of deliverables. *See* Doc. 124-7, p. 3. Accordingly, Walmart contends these terms are ambiguous and that the jury should be permitted to look at the parties' course of conduct in order to interpret them. "Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one equally reasonable interpretation. The determination of whether an ambiguity exists is ordinarily a question of law for courts to resolve." *Crittenden Cnty. v. Davis*, 2013 Ark. App. 655, at *7 (internal citation omitted).

The Court agrees with Walmart that it has not yet formally interpreted the words "template," "deliverable," or "work product," though the Court did observe in an earlier Order that the word "deliverable" "appears to be identified with 'Milestones' in Section VI

of the [Statement of Work]." *See* Doc. 197, p. 5.  But neither has the Court declared any of these terms to be ambiguous.  The Court will find now as a matter of law that although they are not formally defined in the contract, the terms "deliverable" and "work product" are not ambiguous.  The Court interprets "deliverable" to refer to anything that was both "authored, developed, conceived, or created for Walmart by [Cuker], either alone or in collaboration with third party subcontractors," *see* Doc. 124-7, p. 2, § 3(a), and provided to Walmart for the purpose of facilitating "the design of responsive desktop, tablet, and smartphone layouts for" the ASDA Groceries website's "home page, navigation, 10 page templates, and responsive template guide," *see* Doc. 197, p. 16.  And the Court interprets "work product" simply to refer to "all deliverables" collectively.  *See* Doc. 124-7, p. 2, § 3(a).  Accordingly, the Court will not permit any party to offer evidence or argument that these contractual terms have any meaning other than how the Court has interpreted them here.

As for the word "template," although the contract does not formally define it, the Court does not believe its use in the contract is ambiguous.  It is an industry- or technology-specific term for which the contract does not provide a formal definition, true, and its meaning within the industry is probably unfamiliar to many laypeople.  But the same is also true of many other terms that appear throughout the contract in this case, such as "navigation," "responsive," "site map," or "wireframe," to give but a few examples. This does not mean the contract is riddled with uncertainties whose interpretations require recourse to parol evidence regarding the parties' course of conduct.  *Cf. Crittendon Cnty.*, 2013 Ark. App. 655, at *8 ("an uncertain agreement may be supplemented by subsequent acts, agreements, or declarations of the parties so as to make it certain and valid").

13

Rather, it simply means more explanation of industry-specific terms will probably need to be provided from witnesses who possess such specialized knowledge, than one typically sees in cases involving less esoteric or specialized technologies. Therefore, the Court will not permit any party to present evidence of the parties' course of conduct as an aid to interpreting the contract, or to argue that any contractual term's meaning is informed by the parties' course of conduct. Accordingly, Cuker's Motion in Limine to Exclude Evidence and Argument that the Scope of Cuker's Services under the Contract Exceeds the Scope Defined by the Court (Doc. 323) will be **GRANTED**.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff Wal-Mart Stores, Inc.'s Motion in Limine to Preclude Improper Statistical Expert Testimony (Doc. 306) is **GRANTED**; Plaintiff Wal-Mart Stores, Inc.'s Motion in Limine to Exclude Evidence of Cuker's Damages in Excess of Contract Price (Doc. 257) is **DENIED**; and Defendant Cuker Interactive, LLC's Motion in Limine to Exclude Evidence and Argument that the Scope of Cuker's Services under the Contract Exceeds the Scope Defined by the Court (Doc. 323) is **GRANTED**.

**IT IS SO ORDERED** on this 5ᵗʰ day of April, 2017.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE