**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**WAL-MART STORES, INC.**                                         **PLAINTIFF/**
                                                       **COUNTER-DEFENDANT**

**V.**                        **CASE NO. 5:14-CV-5262**

**CUKER INTERACTIVE, LLC**                                         **DEFENDANT/**
                                                       **COUNTER-CLAIMANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Currently before the Court are:

- Defendant/Counter-Claimant Cuker Interactive, LLC's ("Cuker") Motion for Sanctions against Walmart and its Counsel (Doc. 464) and Brief in Support (Doc. 465); Plaintiff/Counter-Defendant Wal-Mart Stores, Inc.'s ("Walmart") Response in Opposition (Doc. 479); and Cuker's Reply (Doc. 481);

- Cuker's Motion for Attorneys' Fees and Costs (Doc. 473) and Brief in Support (Doc. 474); Walmart's Response in Opposition (Doc. 480); and Cuker's Reply (Doc. 481);

- Cuker's Bill of Taxable Costs pursuant to 28 U.S.C. § 1920 (Doc. 475); and Walmart's Objection (Doc. 476);

- Walmart's Motion for Judgment as a Matter of Law under Rule 50(b) (Doc. 490) and Brief in Support (Doc. 501); Cuker's Response in Opposition (Doc. 512); and Walmart's Reply (Doc. 519);

- Walmart's Motion for New Trial or Remittitur under Rule 59 (Doc. 493) and Brief in Support (Doc. 499); Cuker's Response in Opposition (Doc. 511); and Walmart's Reply (Doc. 515);

- A Motion to Withdraw (Doc. 520) and Brief in Support (Doc. 521) filed by Cuker's Arkansas attorneys in this case; and

- A Motion to Withdraw (Doc. 522) and Brief in Support (Doc. 523) filed by Cuker's California attorneys in this case.

For the reasons given below, Cuker's Motions for Sanctions and for Attorneys' Fees and Costs and Walmart's Motion for Judgment as a Matter of Law are **GRANTED IN PART AND DENIED IN PART**, Walmart's Motion for New Trial or Remittitur is **DENIED**, and Cuker's Motions to Withdraw are **GRANTED**.

## I. BACKGROUND

As this Court explained more than a year ago:

On January 30, 2014, Walmart and Cuker signed a contract under which Walmart agreed to pay Cuker a fixed fee of $577,719, in exchange for Cuker's provision of certain services to help make the website for Walmart's "ASDA Groceries business" responsive, irrespective of the device on which it is being viewed, such as a desktop or a mobile phone [("the Contract")]. *See* Doc. 124-7, pp. 8, 17. Walmart was facing very tight internal deadlines for this project, and the contract-negotiation process was a very speedy one, taking merely a few weeks rather than the months that were more typical. *See* Doc. 121-1, p. 3. The project launched almost immediately in early February, and by the end of that month the parties were already experiencing fundamental disagreements on matters such as whether various milestones for performance were strict deadlines or mere aspirations, when interim fee payments were due, how many rounds of revisions Walmart could require Cuker to make to its deliverables, and whether particular demands by Walmart were outside of the scope of work that Cuker had contracted to deliver.

(Doc. 197, pp. 1–2). Eventually, in July 2014, Walmart won a race to the courthouse, and the following month this lawsuit was removed from the Circuit Court of Benton County to

this Court. The parties asserted various cross-claims against each other, and extremely heated and tortured litigation followed over the next several years.

On April 10, 2017, the case finally went to trial, which lasted two weeks. The jury returned a verdict against Walmart on its claim against Cuker for breach of contract, and in favor of Cuker on its claims against Walmart for breach of contract, unjust enrichment, and misappropriation of trade secrets. The jury awarded Cuker a total of $12,438,665 in damages. The Court subsequently reduced this amount to $10,197,065, and on July 28, 2017, entered Judgment in favor of Cuker, including injunctive relief. *See* Doc. 484. After the entry of Judgment, post-verdict motion practice ensued. The Court stayed execution on the money judgment, *see* Doc. 488, and stayed the injunction, *see* Doc. 503, pending resolution of the various post-trial motions.

This Opinion and Order resolves all pending motions in this case. The above-mentioned motions are all ripe for decision, and can be divided into three categories. First, Walmart has filed two motions concerning the evidence that came in at trial. Second, Cuker has filed two motions concerning attorney fees, costs, and sanctions that it seeks to recover from Walmart. And third, Cuker's attorneys have filed two motions seeking to withdraw from this case. Below, the Court will address those motions in the sequence just listed.

## II. WALMART'S MOTIONS ABOUT THE TRIAL

In this Section, the Court will first take up Walmart's Motion for Judgment as a Matter of Law under Rule 50(b). Then, the Court will turn to Walmart's Motion for New Trial or Remittitur under Rule 59.

**A.  Walmart's Motion for Judgment as a Matter of Law under Rule 50(b) (Doc. 490)**

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Fed. R. Civ. P. 50(a).  "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a)," then upon a timely renewal of that motion after the entry of judgment, the Court may allow judgment on the verdict, order a new trial under Rule 59, or direct the entry of judgment as a matter of law.  *See* Fed. R. Civ. P. 50(b). "The law places a high standard on overturning a jury verdict because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused." *Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017) (quoting *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002)) (internal alterations omitted). Accordingly, when considering a renewed motion for judgment as a matter of law, the Court must:

> (1) consider the evidence in the light most favorable to the prevailing party, (2) assume that all conflicts in the evidence were resolved in favor of the prevailing party, (3) assume as proved all facts that the prevailing party's evidence tended to prove, and (4) give the prevailing party the benefit of all favorable inferences that may reasonably be drawn from the facts proved. That done, the court must then deny the motion if reasonable persons could differ as to the conclusions to be drawn from the evidence.

*Id.* (quoting *Ryther v. KARE 11*, 108 F.3d 832, 844 (8th Cir. 1997) (en banc)).

Walmart has marshaled an enormous number of arguments in support of its Rule 50(b) Motion.  As a consequence of some of the rulings herein, many of Walmart's

arguments will not need to be reached. But the arguments that will be reached are organized below as follows. First, the Court will address arguments concerning Cuker's claim for breach of contract. Second, the Court will turn to Cuker's claim for unjust enrichment. Third, the Court will take up Cuker's trade secret claims. Fourth, the Court will deal with Walmart's argument about Copyright Act preemption. And fifth, the Court will rule on Walmart's argument about capping Cuker's damages pursuant to a limitation-of-liability clause in the Contract.

### 1. Cuker's Claim for Breach of Contract

The jury found for Cuker on its claim against Walmart for breach of contract. *See* Doc. 444, p. 5. Walmart argues that this verdict should be reversed because "Cuker failed to perform the contract according to its terms," and "introduced insufficient evidence of any facts that would excuse its non-performance of the contract." *See* Doc. 501, p. 82. Walmart's briefing on this issue focuses exclusively on alleged failures of performance by Cuker in the months of May and June of 2014. Specifically, Walmart argues that Cuker breached the contract by withholding the May 23 and June 25 code drops until July 17 despite having completed its work on them by June 2. *See id.* at 82–86. Walmart also points to Cuker's failure to deliver testing reports/issue resolution summaries by May 14 and June 13, and to Cuker's failure to provide 30 days of post-launch support for the website, as breaches excusing Walmart's performance under the contract. *See id.* at 86.

The Court instructed the jury that "a 'material breach' is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party," and that "[a] material breach by one party excuses the performance of the other party." *See* Doc. 434, p. 18. The Court also instructed the jury that "the law implies

a promise between the parties that they will not do anything to prevent, hinder, or delay the performance of the contract," and that the jury could "consider the alleged acts, hindrances, and delays of Walmart . . . as evidence of a breach of the contract." *See id.* at 17.

The Court disagrees with Walmart, and believes that Cuker *did* introduce sufficient evidence of facts from which a jury could reasonably find that Cuker's performance under the contract was excused. Aaron Cuker testified that on February 12, 2014, Walmart asked Cuker to design 80 wireframes—a number far in excess of the 13 templates required by the Contract—and then threatened to withhold approvals (and, consequently, payments) for within-scope work unless Cuker complied with this request. *See* Doc. 407, pp. 198–206, 295; Defendant's Exhibits 36, 39. And Nikolaj Baer testified that Walmart never provided a workable development environment as required by the Contract, thus requiring Cuker to create a development environment itself in order to perform its own obligations under the Contract. *See* Doc. 411, pp. 48–49, 76–82; Plaintiff's Exhibit 126, p. 15, row 5. The jury could credit this testimony, and could conclude that these demands, threats, and failures of performance by Walmart in February 2014 substantially defeated the purpose of the Contract for Cuker, and prevented, hindered, and delayed Cuker's performance under the Contract, by forcing Cuker to choose between two unacceptable options: (1) either perform an enormous amount of additional work that Cuker never agreed to perform under the fixed-price Contract, and thereby become unable to meet the "milestone" dates set out in the Contract for the work that it *was* obligated to do, or else (2) refuse to do the additional work but at the explicit risk of not being paid even for

the work it *did* perform under the Contract.  The jury's verdict on Cuker's contract claim is supported by sufficient evidence.

## 2. Cuker's Claim for Unjust Enrichment

Cuker argued at trial that Walmart was unjustly enriched by Cuker's provision of additional templates to Walmart that were not required under the Contract.  The jury found for Cuker on its claim of unjust enrichment.  Walmart argues that this verdict should be reversed on the grounds that it was not supported by sufficient evidence at trial.

The Court held very early in this case that although in general "a claim for unjust enrichment cannot stand where the parties have a contractual relationship on the same subject matter," there is an exception that permits claims for unjust enrichment where "disputed performance" under a contract "is compelled under protest."  *See* Doc. 23, p. 4 (quoting *QHG of Springdale, Inc. v. Archer*, 2009 Ark. App. 692, at *11).  Walmart argues that there was insufficient evidence at trial that Cuker protested, *see* Doc. 501, pp. 75–78, and insufficient evidence at trial that Cuker's performance was compelled, *see id.* at 78–82.  The Court disagrees with both of these contentions.  As was already discussed in the preceding Section, Cuker introduced evidence that as early as February 2014, it was already objecting to requests from Walmart for a large number of wireframes on the grounds that they exceeded the scope of the Contract, but seeing these objections met with threats to withhold approvals (and therefore payments).[1]  This evidence, in

---

[1] Walmart contends that because these objections were to "wireframes," rather than "templates," Walmart was not unjustly enriched by the receipt of excess templates.  *See* Doc. 501, p. 80 n.35.  This is an artificial distinction, because Cuker introduced testimony that wireframes are simply early-stage designs for templates.  *See* Doc. 407, pp. 129–30, 174–76.  The whole point of Cuker's objection was that it was being asked, for no additional compensation, to design a larger number of templates than it had contracted to design.

combination with testimony that was provided about Cuker's precarious financial position during the term of the Contract, *see, e.g.*, Doc. 407, pp. 205–06, is sufficient to support a finding that Cuker protested "early and often," *see QHG*, 2009 Ark. App. 692, at *11, and that Walmart nevertheless exploited Cuker's financial vulnerability to compel Cuker to perform work outside the scope of the Contract.

Walmart emphasizes that Cuker waited six weeks after it had completed the additional templates on June 2 before providing them to Walmart on July 17 on the advice of its lawyer, and argues that this shows Cuker was not operating under any compulsion to turn the templates over. *See* Doc. 501, pp. 80–81. Cuker introduced an email showing that as of June 1, it hoped to separate its in-scope work from its out-of-scope work before making its final delivery to Walmart. *See* Defendant's Exhibit 247. But Mr. Baer testified that after roughly a week of attempting to do this, he concluded that the in-scope and out-of-scope templates had become effectively inseparable. *See* Doc. 411, pp. 161–62. And Mr. Cuker testified that Walmart was refusing to pay any additional compensation for Cuker's out-of-scope work. *See* Doc. 407, p. 255. If the jury credited all of this testimony, then a natural inference from it would be that after June 2, Cuker had to choose between failing to deliver what it had contracted to deliver, or delivering far more than it had contracted to deliver at the risk of never being paid for the additional work it had already performed under Walmart's compulsion. A jury could easily conclude from these circumstances that Walmart's enormous leverage over Cuker, and Cuker's perception of it, was as stark on July 17 as it was on June 2, and that the delay before the final code drop simply proved that Cuker was facing a very difficult decision rather than that Cuker was not under compulsion.

In addition to its arguments about protest and compulsion, Walmart contends that Cuker's theory of damages from unjust enrichment was "premised on speculative and unsupported expert opinions." *See* Doc. 501, p. 109. The theory of unjust enrichment damages that Cuker's expert, Patrick Kennedy, presented to the jury, was premised on the notion that damages could be calculated on a per-template basis. *See* Doc. 416, pp. 251–53. Walmart previously filed a *Daubert* motion seeking exclusion of Dr. Kennedy's opinions on unjust enrichment damages, similarly arguing that they were speculative and unsupported; the Court rejected Walmart's arguments then, and ruled that Dr. Kennedy would be permitted to present this theory to the jury, because Walmart's criticisms of his per-template calculations went to weight rather than admissibility. *See* Doc. 173. Walmart's Rule 50(b) motion essentially reformulates those arguments which the Court previously rejected, arguing that Dr. Kennedy lacked a foundation for treating the Contract price as a function of the number of templates in its scope of work, and that he "cherry-picked" a comparator contract against which to test the reasonableness of his per-template price estimate. The Court rejects these arguments now for the same reasons it did before. *See id.*

Walmart also argues, as it previously did in its *Daubert* motion, that Cuker is not entitled to any damages for unjust enrichment because the Contract required "any fees exceeding $577,719, not including travel and expense fees" to be "pre-approved in writing by Walmart in the form of a Project Change Request per the Agreement." *See* Doc. 501, p. 111. But in the Court's view, this argument misses the point. Of course, as the Court has already observed several times throughout this case, the general rule is that "[w]here the parties have an enforceable contract that fully addresses a subject, they must proceed

on that contract in resolving their differences," but again, we are dealing here with an *exception* to this rule that applies where "disputed performance is compelled under protest." *See QHG*, 2009 Ark. App. 692, at *11. The jury found that this is exactly what happened here, and for the reasons given above, there was a sufficient evidentiary basis for this finding. The Court does not see what sense it would make to find that a contract precludes damages for unjust enrichment under the very circumstances where the law states a contract should be trumped by the concerns of "equity and good conscience." *See id.* at *13. The jury's verdict on Cuker's claim for unjust enrichment will stand.

### 3. Cuker's Claim for Misappropriation of Trade Secrets

Cuker brought claims against Walmart for misappropriation of trade secrets. The jury was presented with verdict forms regarding four separate alleged trade secrets: (1) a "Phased Release Support Technique"; (2) the "CMS Tweak Development Tool"; (3) "Adobe Illustrator Source Files for Wireframes and Adobe Photoshop Source Files for Designs" (collectively, "Adobe Source Files"); and (4) "Zoning Tools." The jury found that Walmart misappropriated all four of these trade secrets, and that Walmart did so willfully and maliciously with respect to each of them except the CMS Tweak Development Tool. The jury awarded Cuker a total of $12,008,036 in damages on its trade secret claims, *see* Doc. 444, pp. 9–12, but the Court subsequently reduced that award to $9,766,436, pursuant to the Contract's limitation-of-liability clause, *see* Doc. 483, p. 9.

Walmart now advances a large variety of theories under which it contends the jury's trade secrets verdict should be reversed. However, the vast majority of these arguments need not be reached in this Opinion and Order, because one of them is dispositive with respect to three of Cuker's alleged trade secrets. Specifically, the Court

agrees with Walmart that there is insufficient evidence to support the jury's finding that Cuker's Phased Release Support Technique, CMS Tweak Development Tool, and Zoning Tools meet the statutory definition of "trade secret" under Arkansas law. In the first subsection below, the Court will discuss those three alleged trade secrets. Then in the second subsection below, the Court will turn to Cuker's Adobe Source Files, which present rather more complicated issues.

### a. Phased Release, CMS Tweak, and Zoning Tools

The Arkansas Trade Secrets Act ("ATSA"), which prohibits misappropriation of trade secrets, defines "trade secret" as meaning:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ark. Code Ann. § 4-75-601(4). For each of three alleged trade secrets, there is insufficient evidence that it was the subject of reasonable efforts to maintain its secrecy.

With respect to the Phased Release Support Technique and Zoning Tools, there was unrebutted evidence at trial that as early as February 14, 2014, Cuker was telling Walmart that Cuker would provide Walmart with "phased release support" and "zoning" as "key component[s]" of its technical approach. *See* Plaintiff's Exhibit 200, pp. 1, 7–8. There was also unrebutted evidence that Walmart and Cuker both understood that the code Cuker would provide to Walmart would be for the front end of the ASDA website. *See* Doc. 411, pp. 46–47. And there is no evidence in the record that Cuker ever "clearly

identif[ied]" its Phased Release Support Technique and Zoning Tools as "information it considered to be a trade secret" at any time before this information was disclosed to Walmart. *Tyson Foods, Inc. v. ConAgra, Inc.*, 349 Ark. 469, 483 (2002). The closest Cuker ever came to providing any such evidence was through testimony from Mr. Baer that when Hemanth Narayanan from Walmart "insist[ed]" to him in early February 2014 that the project would need phased release and zoning support from Cuker, Mr. Baer "was stunned" and "felt railroaded," *see* Doc. 411, pp. 60, 65, 179–80. 228–29; similarly, Mr. Cuker testified that zoning tools were provided to Walmart "under protest," *see* Doc. 407, pp. 47. But while this is evidence that Cuker believed these items were outside the contractual scope of work, it is *not* evidence that Cuker told Walmart that it considered this information to be *secret*, or that Walmart had any reason to believe it was secret. Thus, there is insufficient evidence to support a finding that Cuker's Phased Release Support Technique and Zoning Tools "reasonably should [have been] considered confidential" by Walmart "under the circumstances," *see* Plaintiff's Exhibit 126, p. 2, § 4(b), since all indications to Walmart *from Cuker* as of February 14 were that the code for these things would soon be located on the front end of the ASDA website for all the world to see. *See, e.g.*, Doc. 411, pp. 70–73, 76, 105–06, 186–87 (testimony from Mr. Baer about his ability to find and read Cuker-authored code today on the ASDA website by simply visiting it with an internet browser).

Cuker's claim for its CMS Tweak Development Tool suffers from a similar deficiency. Cuker provided unrebutted testimony through Mr. Baer that this tool was "created . . . for this Wal-Mart project at the beginning of the project when we didn't have a development environment," and that in creating it, Cuker relied on its extensive

experience and know-how acquired from creating development environments on prior projects for other clients. *See* Doc. 411, pp. 77–78, 81–82. Mr. Baer testified that prior to Cuker's April 8 code drop, in the middle of an ongoing dispute about the scope of work under the contract, Cuker was "getting a lot of pressure to give [Walmart] the code" and Walmart was telling Cuker that it did not trust that Cuker was making adequate progress. *See id.* at 84. As Walmart did not have a working development environment when Cuker delivered its April 8 code drop, Cuker provided the CMS Tweak Development Tool because "the only way to get them to see that we were making progress at that time was to give them our development environment that we had created." *See id.* But there was no evidence at trial that Cuker ever told Walmart that it considered this tool to be confidential or proprietary, or that it did not want Walmart to use it or share it with others.

Therefore, there was insufficient evidence to support the jury's finding that Cuker undertook reasonable efforts to maintain the secrecy of its Phased Release Support Technique, CMS Tweak Development Tool, and Zoning Tools as required by Ark. Code Ann. § 4-75-601(4)(B). The jury's verdict will be reversed as to those three alleged trade secrets. The Court will turn now to the last remaining alleged trade secret: Cuker's Adobe Source Files.

### b.  Adobe Source Files

Unlike the other three alleged trade secrets, there was sufficient evidence at trial to support the jury's finding that Cuker's Adobe Source Files met the statutory definition of "trade secret." Mr. Cuker testified that the Adobe Source Files contained information that predated the Walmart Contract and that was developed internally over a period of years through trial-and-error, *see* Doc. 407, pp. 228–29, that this information included

Cuker's internally-developed methods for optimizing layouts, constructing responsive web pages, and simultaneously pushing changes across multiple responsive files, *see id.* at 246–47, that this information provided Cuker its "competitive advantage in the market," *see id.*, and that Cuker never turns its Adobe Source Files over to clients, *see id.* at 267. Mr. Cuker also testified that Walmart repeatedly asked him for them and that he repeatedly told Walmart "no," *see id.* at 266–67, and this testimony was corroborated by Walmart's own witness, Alex Alexander, *see* Doc. 409, p. 132. Walmart's internal emails show that as early as March 6, before Walmart had even made its first request for Cuker's Adobe Source Files, Walmart intended to manufacture an excuse for requesting them in anticipation of the fact that Cuker would consider such a request "irregular." *See* Defendant's Exhibit 485, p. 1 ("We always download a copy of all UX deliverables, so we have the wireframe review docs anyway. We don't however have source files so wouldn't be able to edit these easily. Are you expecting us to ask for these? *It could seem a little irregular but I'm sure I could phrase it that the team here need to start working on pages and flows that Cuker will not be covering.*" (emphasis added)). And subsequent internal emails show that Walmart had concerns about the appropriateness of requesting Cuker's Adobe Source Files. *See, e.g.*, Defendants' Exhibit 85, p. 1 ("We [Walmart] don't have the source files for wireframes yet . . . due to the tensions *[I] didn't feel it was an appropriate request by email.*" (emphasis added)). Indeed, when asked if source files are "a typical request" by clients, Mr. Cuker replied "[a]bsolutely not," and testified that he could not recall any other customers of his having ever requested them. *See* Doc. 407, p. 233. And Cuker's damages expert, Chuck Easttom, testified that in his experience working with design firms, when clients request source files such requests are "normally

pretty firmly rejected." *See* Doc. 413, pp. 258–59. The jury could reasonably infer from all of this that Walmart reasonably believed Cuker's Adobe Source Files contained confidential materials and trade secrets.[2]

There is also sufficient evidence in the record to support the jury's finding that Walmart *misappropriated* Cuker's Adobe Source Files. The ATSA defines "misappropriation" as meaning:

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    (i)    Used improper means to acquire knowledge of the trade secret; or

    (ii)    At the time of the disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

        (a) Derived from or through a person who had utilized improper means to acquire it;

        (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (iii)    Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

---

[2] Walmart complains that "[t]he jury had no way of identifying any source file" on the hard drive that was introduced into evidence, "or identifying what it was, when it was created, how it was a trade secret, or, for that matter, tying it to any alleged misappropriation by Walmart." *See* Doc. 501, p. 56. The Court disagrees; the Adobe Source Files are easily identifiable by their .ai or .psd file extensions. And there was ample evidence of what particular information in those source files was confidential, as discussed in the paragraph containing the reference to this footnote.

*Id.* at § 4-75-601(2). In other words, "the statute separates 'use' from 'disclosure' and either or both may support an action." *Sw. Energy Co. v. Eickenhorst*, 955 F. Supp. 1078, 1084 (W.D. Ark. 1997). The ATSA's use of the word "person" may refer either to "a natural person" or to "any . . . legal or commercial entity." *See* Ark. Code Ann. § 4-75-601(3). And the ATSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* at § 4-75-601(1).

Cuker introduced documentary and testimonial evidence at trial that despite Mr. Cuker's repeated rebuffs of Walmart's requests for Cuker's Adobe Source Files, Walmart eventually conditioned its approvals (and therefore its payments under the Contract) on receipt of Cuker's Adobe Source Files, forcing Mr. Cuker to choose between forgoing payment of his employees for the work they had already done under the Contract, or to divulge confidential information to which Walmart was not entitled. *See* Doc. 407, pp. 235–39; Defendant's Exhibit 94. Walmart argues that Cuker's acquiescence to this demand contractually entitled Walmart to use the Adobe Source Files, since the Contract states that "Deliverables must not include, and [Cuker] may not incorporate, [Cuker]'s preexisting proprietary information," and that Cuker "grants to Walmart a . . . perpetual license to use" any such intellectual property that is nevertheless "made part of the Deliverables." *See* Plaintiff's Exhibit 126, p. 2, § 3(c). But this argument ignores the Court's previous interpretation of the contractual term "deliverables," which requires that they have been "authored, developed, conceived, or created *for Walmart* by Cuker," *see* Doc. 379, p. 13 (emphasis added)—which, as has already been discussed, Mr. Cuker testified the Adobe Source Files were not. In the alternative, Walmart argues that it was

contractually entitled to the Adobe Source Files because the Contract also grants Walmart a perpetual license to use any of Cuker's intellectual property that is "required to use the Deliverables or receive benefit from [Cuker]'s Services." *See* Plaintiff's Exhibit 126, p. 2, § 3(c). But although Michael O'Sullivan testified for Walmart that Walmart needed Cuker's Adobe Source Files in order to create designs for other pages on the ASDA website, *see* Doc. 406, pp. 52, 91, Mr. Cuker testified to the contrary, *see* Doc. 407, pp. 247–48. The jury could reasonably credit Mr. Cuker's testimony on this point over and against Mr. O'Sullivan's testimony, especially in light of Mr. Cuker's additional testimony that Cuker had never before shared its Adobe Source Files with clients, *see* Doc. 407, p. 248, and in light of the previously-quoted email indicating that this very excuse for seeking the Adobe Source Files was a sham.

Finally, there was certainly sufficient evidence for the jury to find that Walmart used Cuker's Adobe Source Files and disclosed them to others, given Mr. O'Sullivan's and Mr. Narayanan's own testimony that Walmart in fact did so. *See* Doc. 406, pp. 30, 148; Doc. 413, pp. 49–53. And the jury could easily find from all of the foregoing evidence not only that Cuker's Adobe Source Files were a trade secret and that Walmart misappropriated it, but also that Walmart's misappropriation was willful and malicious in that "Walmart contemplated the existence of the trade secret and took actions in reckless disregard as to whether those actions would constitute misappropriation of that trade secret." *See* Court's Exhibit 37.

However, Walmart also challenges the jury's award of *damages* with respect to Cuker's Adobe Source Files. Cuker argued at trial that Walmart's misappropriation of Cuker's trade secrets allowed Walmart to save costs and time, by making the ASDA and

Walmart2Go websites responsive more quickly than would have been possible otherwise; and Cuker sought disgorgement of these savings as damages. In accordance with this theory, the jury awarded Cuker $2,788,690 in damages for Walmart's misappropriation of Cuker's Adobe Source Files. *See* Doc. 444, p. 11. The Court believes this award must be significantly reduced.

Under the theory of damages that Cuker presented at trial, $1,901,786 of this award is attributable to certain "cost savings" and a "market rate adjustment" for the role played by an Indian internet technology services firm called "Wipro" in making the websites for ASDA and Walmart2Go responsive. *See* Doc. 406, p. 33; Doc. 416, pp. 264, 273 ($819,650 in market rate adjustment for two months of saved time); Doc. 436, p. 182 ($1,082,136 in cost savings). Essentially, the argument was that Wipro did not originally have the ability or capacity to do responsive web design, but that Walmart was able to teach Wipro these skills by sharing Cuker's trade secrets with Wipro, and then to save costs and time by utilizing Wipro on these projects because Wipro charged a rate that was well below market for responsive web design agencies. *See* Doc. 416, pp. 255–64, 267–68. The problem with this theory, however, is that there was no evidence at trial that Cuker's Adobe Source Files actually played any role in Wipro's work. To be clear, there *is* evidence that Wipro was given *access* to Cuker's Adobe Source Files. For example, Mr. O'Sullivan testified that he "shared the three code drops that [he] received from Cuker to Wipro." *See* Doc. 406, p. 35. And Walmart does not deny that Wipro worked on the ASDA and Walmart2Go responsive projects. *See, e.g.*, Doc. 406, pp. 35–36; Doc. 432, pp. 130–31. But there is simply no evidence anywhere in the record showing that anywhere from 0 to 100 percent of the work Wipro did on either of these projects actually

involved Cuker's Adobe Source Files or depended on information that Wipro acquired from them. Or put differently, there is no evidence in the record that Walmart's misappropriation of Cuker's Adobe Source Files proximately caused any of these alleged Wipro-related damages. *See 3A Composites USA, Inc. v. United Indus., Inc.*, 2015 WL 5437119, at *5; Ark. Code Ann. § 4-75-606(a). Thus, the $1,901,786 in damages attributable to the Wipro-related "cost savings" and "market rate adjustment" will be removed from the jury's award, because it is pure speculation and not reasonably grounded in evidence. *See Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 417 (8th Cir. 2005).

Of the remaining $886,904 in the jury's award, $314,392 is attributable to time saved on the ASDA project and $572,512 is attributable to time saved on the Walmart2Go project. *See* Doc. 416, pp. 264, 273. But there was no evidence at trial that Cuker's Adobe Source Files were ever shared or even made available to Cloud Four, which was the design firm that worked on the Walmart2Go project. Indeed, the only evidence to speak to the issue at trial, if credited, showed that Cuker's Adobe Source Files were *not* shared with Cloud Four. Cloud Four employees testified that they stopped using Adobe Illustrator and Photoshop to create responsive designs before they ever began the Walmart2Go project and that they still do not do so today. *See* Doc. 416, pp. 165–66, 214. Cloud Four employees also testified that they were not even given access to the Walmart2Go codebase during the Walmart2Go project. *See* Doc. 411, p. 287; Doc. 416, p. 177. And perhaps most importantly, Cloud Four employees testified that the only Cuker design files they were ever shown were static files, not source files. *See* Doc. 416, pp. 162, 175, 181, 212–13. Since there was no evidence at trial showing that Cuker's Adobe

Source Files were ever used in the Walmart2Go project, the $572,512 in damages attributable to savings on the Walmart2Go project will be removed from the jury's award. As with the Wipro-related alleged damages, this award is grounded only in speculation and there is insufficient evidence to support a finding of proximate cause.

Turning now to the last remaining portion of the jury's trade-secret award, which is attributable to time saved on the ASDA project—Dr. Kennedy calculated that Walmart "actually spent" $157,196 per month "to develop the responsive web design capabilities on the ASDA site."[3]  *See* Doc. 416, pp. 263–64.  So, of course, the remaining $314,392 of the jury's award is consistent with a finding that Walmart saved two months of time on the ASDA project by misappropriating Cuker's Adobe Source Files.  The question, then, is whether there is sufficient evidence to support such a finding.

Susie Spencer and Mr. Alexander both stated in emails that obtaining Cuker's Adobe Source Files would speed up the ASDA project.  *See* Plaintiff's Exhibit 361, p. 3; Defendant's Exhibit 91.  And as has already been mentioned, Mr. O'Sullivan and Mr. Narayanan both testified that the ASDA website did eventually use at least some of Cuker's Adobe Source Files and even still does today.  When asked to quantify how much

---

[3] Walmart argues that this calculation, which is based on payments Walmart made to outside vendors on the ASDA project, is not supported by sufficient evidence that these vendors' work "was responsive design work using Cuker's trade secrets."  *See* Doc. 501, p. 100.  But this argument misses the point, at least with respect to the head-start damages for Cuker's Adobe Source Files that do not contain any "market rate adjustment" for Wipro's services.  Rather, the point, as discussed above, is that there is sufficient evidence to support a finding that the ASDA website used Cuker's Adobe Source Files; there is no dispute that these payments were made to outside vendors for their work—of whatever sort—on the ASDA responsive project, and Cuker's damages theory is that the less time it took to finish the project, the less money it had to pay these vendors for their work on the project—regardless of whether or how much those vendors' work consisted of "design" or utilized Cuker's trade secrets.  *Someone* did design work, and *someone* utilized Cuker's trade secrets, and that saved time for *everyone.*

of a head start on the ASDA project Walmart obtained from Cuker's material, Mr. Easttom conceded that "unfortunately, there's not a specific mathematical formula," but then stated that, "based on a lot of experience doing this, I can look at the various items that they got from Cuker and ask myself what would an ordinary programmer have had to do without these." *See* Doc. 416, p. 18. He then opined that the amount of time saved could range anywhere from "three or four months" if the receiving programmer is "incredibly experienced with responsive design," to "eight or nine months" or even "ten months" if the receiving programmer is "a novice programmer, or at least new to responsive design." *See id.* at 18, 94. In making this estimation, Mr. Easttom was taking into account *all* of the materials that Cuker delivered, regardless of whether it was in-scope or out-of-scope work, including "the zoning, the templates, the phased release, all of it together." *See id.* And Mr. Alexander testified that his in-house team at ASDA "did not have responsive web design skills" when they hired Cuker. *See* Doc. 409, p. 105.

If the jury credited all of this evidence, then it could reasonably conclude that Walmart saved as many as ten months of time on the ASDA project from *all* of the materials it received from Cuker. But the strength of foundation for a finding that Cuker's Adobe Source Files were responsible for twenty percent of those time-savings is a more difficult issue. The only testimony in the record attempting to disaggregate various sources of time-saving comes from Dr. Kennedy, who testified that Mr. Easttom provided him "an overall estimate of about six months, give or take," of time-savings for all of Cuker's *trade secrets*, with four of those months attributable to phased release, and "one to two months for . . . the others, with the exception of zoning," which did not save Walmart any time. *See* Doc. 416, p. 274. Dr. Kennedy testified on cross-examination that he was

relying on this opinion by Mr. Easttom as a foundation for his own opinions, because Mr. Easttom was a "technical expert," and that it was "typical" for him to rely on foundational opinions by technical experts "on intellectual property cases." *See id.* at 281. "Pursuant to Rule 703, an expert may rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field." *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997). Importantly, while such hearsay is admissible "for the limited purpose of exposing the factual basis of the expert's opinion," it "is inadmissible as substantive evidence to prove the truth of the fact asserted." *See Brennan v. Reinhart Institutional Foods*, 211 F.3d 449, 451 (8th Cir. 2000). However, "once expert testimony has been admitted, the rules of evidence then place the full burden of exploration of facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination." *Id.* (internal alterations and quotation marks omitted).

Before Dr. Kennedy testified, the Court asked counsel for Walmart "[d]o you anticipate objecting to the presentation of any particular opinion, or are you going to be satisfied with cross-examination?" (Doc. 416, p. 146). Counsel for Walmart responded that it intended to object on *Daubert* grounds to Dr. Kennedy's opinions about converting Wipro's rates to market rates—a matter ultimately decided in Walmart's favor earlier in this very Opinion and Order. *See id.* at 146–50. The only other issue mentioned by counsel for Walmart in response to the Court's question was as follows:

> We did file, and we thought we were correct in filing, a challenge to Mr. Easttom's opinion that there was a six-month head start, but your Honor

> ruled on that, and we did respond to the order to show cause,[4] and we are
> not reurging that. But we believe that issue can be exposed through cross-
> examination.

*See id.* at 146–47. And true to its expressed intention, Walmart never objected to Dr.

Kennedy's foundational hearsay use of Mr. Easttom's head-start opinions, though it did

vigorously cross-examine Dr. Kennedy on the issue. *See, e.g.*, *id.* at 281–87. For that

matter, Walmart also vigorously cross-examined Mr. Easttom on the issue. *See, e.g.*, *id.*

at 93–98. Because Walmart availed itself of the opportunity to cross-examine both of

Cuker's experts on this issue and never objected to Dr. Kennedy's foundational hearsay

use of Mr. Easttom's head-start opinions, and because an award of $314,392 is

consistent with the other evidence in this case with respect to Walmart's misappropriation

of Cuker's Adobe Source Files as described above, the Court will permit this portion of

the jury's award to stand. *See Brennan*, 211 F.3d at 451–52. "The fact that a party can

state the amount of damages he suffered only approximately is not a sufficient reason for

---

[4] Before trial, the Court had ruled that as a sanction for Walmart's abuses of the financial discovery process, Dr. Kennedy would be permitted to file an expert report after the pretrial motions deadline had passed, Walmart would not be permitted to file any motions challenging that expert report after the motions deadline had passed, and Walmart would not be permitted to submit its own expert damages report. Nevertheless, on April 6, 2017, four days before trial and well after the motions deadline of March 15, 2017, Walmart filed a Motion to Strike Undisclosed Expert Opinions of Chuck Easttom II (Doc. 384), arguing that Dr. Kennedy, in his recently-issued expert report on trade secret damages, was serving as a conduit for previously-undisclosed opinions of Mr. Easttom on this head-start theory, *see* Doc. 385. That same day, the Court denied Walmart's Motion to Strike, ruling that Mr. Easttom had in fact given Walmart timely notice of his head-start opinions, noting that Walmart's Motion had been filed in contravention of this Court's prior ruling, and ordering "Walmart and its attorneys to show cause why additional sanctions should not be imposed for the filing of materials with the purpose of harassing, causing unnecessary delay, or needlessly increasing the cost of litigation." *See* Doc. 387, pp. 3–4. This was the last event in an appallingly lengthy series of abusive practices in this case by Walmart, of which much more will be said below in Section III of this Opinion and Order.

disallowing damages if from the approximate estimates a satisfactory conclusion can be reached." *Jim Halsey Co., Inc. v. Bonar*, 284 Ark. 461, 468 (1985).

### 4. Copyright Act Preemption

Walmart argued in a motion in limine that Cuker's trade secret claims are preempted by the Copyright Act. *See* Doc. 288. The Court denied that motion. *See* Doc. 378, pp. 182–83; Doc. 388, p. 4. Walmart has raised it again in its Rule 50(b) Motion to preserve the issue for appeal. The Court denies it again, for the same two reasons as before.

First, the Court found, and finds again, that Walmart waived this issue, because it was untimely raised for the first time on March 14, 2017, well after the dispositive motions deadline of August 19, 2016 had expired. *See* Doc. 71, p. 3. (Thus, it bears noting, the Court is skeptical that Walmart has any issue here that can even be preserved for appeal in the first place.)

Second, Cuker's claimed trade secret rights are not equivalent to any of the exclusive rights within the Copyright Act. "A state cause of action is preempted if: (1) the work at issue is within the subject matter of copyright as defined in [17 U.S.C.] §§ 102 and 103 . . . and (2) the state law created right is equivalent to any of the exclusive rights within the general scope of copyright as specified in § 106." *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 428 (8th Cir. 1993). "If an extra element is required, instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright and there is no preemption. *Id.* at 431 (internal quotation marks omitted). Trade secret misappropriation, unlike copyright infringement,

requires an element of "improper means or breach of a confidential relationship." *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 488 (5th Cir. 2016). Because trade secret law protects not only against mere copying but also against any taking that occurs through breach of a confidential relationship or other improper means, *all eleven circuits* to have considered the issue have found trade secret claims not to be preempted by the Copyright Act. *Id.* at 486–87 (collecting cases). This Court agrees with that overwhelming consensus.

### 5. The Contract's Limitation-of-Liability Clause

Walmart argued before trial that Section 9 of the Contract, entitled "Limitation of Liability," *see* Plaintiff's Exhibit 126, p. 5, caps Cuker's damages at $577,719, *see* Doc. 257. The Court ruled that Section 9 of the Contract was an exculpatory clause, and that it would not be enforced against any damages that were awarded for intentional wrongdoing. *See* Doc. 379, pp. 6–12. Walmart raises its arguments on that issue again in its Rule 50(b) Motion, and the Court now rules on them in the same manner as it did before, adopting and incorporating its prior rulings on that issue by reference. *See id.*

Walmart also argues that there was insufficient evidence at trial of intentional wrongdoing to avoid the liability cap. But the Court has already ruled and explained above that there was sufficient evidence to support the jury's finding that Walmart willfully and maliciously misappropriated Cuker's Adobe Source Files. And the Court also believes that the same evidence which it found was sufficient to support a finding that Walmart "prevented, hindered, and delayed Cuker's performance under the Contract," *see* Section II.A.1 *supra*, is also sufficient to support the jury's finding with respect to unjust enrichment "that Walmart intentionally demanded the services it unjustly received, with the knowledge

or belief that those services were outside the scope of work that the contract required of Cuker," *see* Doc. 444, p. 7. Since there is sufficient evidence to support the jury's findings of intentional wrongdoing by Walmart with respect to both unjust enrichment and misappropriation of Cuker's Adobe Source Files trade secrets, then the Contract's limitation-of-liability clause will not be applied to cap Cuker's damages for unjust enrichment or misappropriation of trade secrets.

To conclude, then: Walmart's Motion for Judgment as a Matter of Law under Rule 50(b) (Doc. 490) will be **GRANTED IN PART AND DENIED IN PART** as follows. The Court will allow judgment to enter on the jury's verdict of $30,629 for Cuker's breach of contract claim against Walmart. *See* Doc. 444, p. 5. The Court will allow judgment to enter on the jury's verdict of $400,000 for Cuker's unjust enrichment claim against Walmart. *See id.* at 7. The Court will enter judgment as a matter of law in the amount of $314,392 for Cuker's claims for misappropriation of trade secrets against Walmart. And the Court will remove Cuker's Phased Release Support Technique, CMS Tweak Development Tool, and Zoning Tools from the scope of the injunctive relief that was previously awarded to Cuker. *See* Doc. 484.

### B. Walmart's Motion for New Trial or Remittitur under Rule 59 (Doc. 493)

"The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). A Court may grant a motion for a new trial if "the verdict is against the weight of the evidence, . . . the damages are excessive, or . . . for other reasons, the trial was not fair to the party moving." *See Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1017 (8th Cir. 2001) (quoting

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).  A motion for new trial may also "raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury."  *See id.*  The decision whether to grant a new trial is committed to this Court's discretion.  *See id.*

The first set of arguments that Walmart makes in its Rule 59 Motion pertain to the jury's award of trade secret damages.  As a threshold matter, the Court would observe that to the extent these arguments contend that the jury's trade-secret damages award was excessive, they are mooted in large part by this Court's rulings on Walmart's Rule 50(b) Motion.  The Court significantly reduced the amount of the jury's damages award to a level that was consistent with the evidence presented at trial, viewed in the light most favorable to the prevailing party (Cuker).  The Court finds this revised award is not against the weight of the evidence at trial, and points in support of that finding to the same evidence it cited in Section II.A above where it found sufficient evidence to support the jury's verdict.

But more broadly, Walmart contends that Cuker's characterization of Wipro as a "lower cost, offshore provider" in its opening and closing statements to the jury was "baseless, and designed to appeal to the passions and prejudices of the jury."  *See* Doc. 499, p. 8.  In support of this contention, Walmart points out that Cuker's damages theory was premised in part on the notion that Wipro's lower rates were attributable *not* to its location in a country with a lower cost of living, but rather to Wipro's alleged inexpertise at responsive web design.  Thus, the argument goes, references to Wipro's "offshore" status were gratuitous.  This would be a fair point so far as it goes, but it is not the whole picture.  Cuker made exactly *one* passing reference to Wipro as a "lower cost, offshore

provider" in its closing argument, *see* Doc. 436, pp. 180–81, but this was *after* Walmart in its own closing argument referred to Wipro as an "offshore vendor" *twice*, *see* Doc. 436, p. 152. Cuker's reference to Wipro's offshore status was gratuitous in light of the way their damages theory was developed at trial, but it happened only once in closing argument, was not a misrepresentation of any fact, and was not tied to any appeals to bigotry or xenophobia. *Walmart*'s references to Wipro's offshore status, on the other hand, walked much closer to that line in order to preemptively mischaracterize Cuker's theory of damages in part: "But their theory is, 'Well, Wipro did a lot of this work, and Wipro are these offshore vendors in India, *and they must not know anything about anything* . . . .'" *See id.* (emphasis added). To be clear, based on how the evidence came in at trial, how scarce these "offshore" references were, and how long the trial lasted, the Court does not believe the jury's verdict was improperly influenced by any sort of bigotry, prejudice, or passion on that point. But if it were, the Court believes Walmart would be more to blame for that than Cuker, and cannot cry foul for it now.

Walmart also argues that "[t]he presence of a biased juror increased the likelihood of a verdict driven by passion and prejudice." *See* Doc. 499, p. 16. After trial but before this Rule 59 Motion was filed, Walmart had requested a hearing on the issue of whether a particular juror's silence in response to certain questions put to the panel during *voir dire* constituted dishonesty to conceal bias against Walmart. *See* Doc. 497. The Court informed the parties, through a July 28, 2017 letter that was published to the docket that same day (with access restricted to the parties), that it did not believe there was good cause to hold a hearing or to believe that this juror was dishonest. *See* Doc. 482. The

Court now adopts and incorporates its July 28 letter as its formal ruling on the issue as raised in Walmart's Rule 59 Motion. *See id.*

The next set of arguments Walmart raises pertain to the jury instructions in this case. To the extent those arguments pertain to jury instructions for trade secrets other than Cuker's Adobe Source Files, they are mooted by this Court's rulings above on Walmart's Rule 50(b) Motion, which granted Walmart judgment as a matter of law on those other trade secret claims. Specifically with respect to Cuker's Adobe Source Files, Walmart argues that the Adobe Source Files verdict form, *see* Doc. 444, p. 11, "did not provide any specificity to the jury regarding what the trade secret was that it was meant to evaluate," *see* Doc. 499, p. 19. This argument is premised on the notion that Cuker failed to adequately describe this particular trade secret to the jury; the Court rejects that argument here for the same reasons it rejected them in Walmart's Rule 50(b) Motion. *See* note 2 *supra*.

Walmart also argues that this verdict form should not have been submitted to the jury because it did not contain a specific interrogatory about whether Cuker's Adobe Source Files were a trade secret, but rather simply asked whether the jury finds, "by the greater weight of the evidence that Walmart misappropriated Cuker's Adobe . . . Source Files . . . ." *See* Doc. 444, p. 11; *see also* Doc. 499, p. 20. But this complaint ignores the fact that the Court instructed the jury that in order to find "misappropriation" they must find the existence of a trade secret, *see* Doc. 434, p. 24, instructed the jury on the definition of "trade secret," *see id.* at 25, and instructed the jury on the elements of a claim for misappropriation of trade secret, *see id.* at 23. The Court sees no reason to believe the jury ignored or forgot the instructions and definitions that were read to it before retiring to

deliberate, especially given that the jury took physical copies of these instructions and definitions with it to the deliberation room.  *See* Doc. 434, p. 3.

Walmart also contends the Court wrongly instructed the jury on the elements of unjust enrichment.  *See* Doc. 499, pp. 20–23.  As the Court explained from the bench in rejecting this argument during the final jury instruction conference, the Court's instruction was drawn from the Arkansas Model Instruction, controlling Arkansas caselaw, and law of the case.  *See* Doc. 436, pp. 84–86.  The Court rejects Walmart's argument now for the same reasons it did before.

Walmart's last Rule 59 argument regarding jury instructions is that the Court wrongly instructed the jury on the burden of proof for a finding that misappropriation was "willful and malicious," and in response to a question from the jury during deliberations about that same instruction, also wrongly instructed the jury on the definition of "malice." *See* Doc. 499, pp. 23–24; Doc. 444, p. 11.  The Court previously rejected these arguments from the bench after extensive oral argument and discussion of Arkansas caselaw on the record, and the Court rejects them now for the same reasons as before.  *See* Doc. 447, pp. 4–20.

Finally, Walmart requests a new trial on the grounds that "the Court improperly excluded evidence of the parties' intent with respect to the scope and terms of the agreement, ruling instead as a matter of law that the $577,719 contract price covered the thirteen templates and nothing more."  *See* Doc. 499, pp. 24–25.  The scope and interpretation of the Contract was a hotly contested issue not only throughout the entire pendency of this case, but during the ASDA project itself.  The Court has made a variety of rulings on this matter with which Walmart has disagreed, and Walmart has adequately

preserved those issues for appeal. But the Court rejects Walmart's arguments regarding parol evidence and the scope of the Contract now for the same reasons it has before. *See, e.g.*, Doc. 379, pp. 12–14.

Accordingly, Walmart's Motion for New Trial or Remittitur under Rule 59 (Doc. 493) will be **DENIED**. The Court turns now to Cuker's motions regarding fees, costs, and sanctions.

## III.  CUKER'S MOTIONS ABOUT FEES, COSTS, AND SANCTIONS

As the prevailing party in this action, Cuker is seeking recovery of attorney fees and costs. In addition, or perhaps in the alternative, to seeking fees and costs as the prevailing party, Cuker is also asking this Court to enter sanctions against Walmart for abusing the judicial process throughout this case. In the first subsection below, the Court will deal with Cuker's Motion for Attorneys' Fees and Costs. Then in the second subsection, the Court will turn to Cuker's Motion for Sanctions against Walmart and its Counsel.

### A.  Cuker's Motion for Attorneys' Fees and Costs (Doc. 473)

This Opinion and Order has focused so far on Cuker's claims against Walmart for breach of contract, unjust enrichment, and misappropriation of trade secrets. And as was discussed at great length above, the Court finds that Cuker is entitled to judgment in the amount of $30,629 on its claim against Walmart for breach of contract claim against Walmart, $400,000 on its claim against Walmart for unjust enrichment, and $314,392 on its claim against Walmart for misappropriation of trade secrets, as well as to injunctive relief from the misappropriation. But these were not the only claims in this case. In order to address the issue of attorney fees, it is necessary to take into account the other claims

that were brought by these parties against each other. Cuker also brought a claim against Walmart for a declaratory judgment that the Contract is void for lack of mutual assent, and a claim against Walmart for fraudulent inducement. *See* Doc. 61-1, pp. 21–23. The Court granted Walmart summary judgment on both of these claims before trial. *See* Doc. 197, p. 26. And Walmart brought a claim against Cuker for breach of contract, which the jury rejected at trial. *See* Doc. 444, p. 3.

Arkansas law governs the issue of attorney fees in this case. *See FutureFuel Chem. Co. v. Lonza, Inc.*, 756 F.3d 641, 649 (8th Cir. 2014). The general rule in Arkansas is that attorney fees are not recoverable in the absence of statutory authority. *See Patton Hosp. Mgmt., LLC v. Bella Vista Vill. Coopershares Owners Ass'n, Inc.*, 2016 Ark. App. 281, at *10. But an Arkansas statute provides that in a contract action, "the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs." Ark. Code Ann. § 16-22-308. And notwithstanding the aforementioned general requirement of statutory authority, attorney fees may be recovered by a prevailing party in an action involving claims for which such authority is lacking, if the action is "*primarily* based in contract." *See Patton Hosp. Mgmt., LLC*, 2016 Ark. App. 281, at *10–*11 (emphasis added); *FutureFuel Chem. Co.*, 756 F.3d at 649 (same). Additionally, the ATSA permits the Court to "award reasonable attorneys' fees to the prevailing party" in a trade secret action if "willful and malicious misappropriation exists." *See* Ark. Code Ann. § 4-75-607(3).

In calculating a reasonable fee, a number of factors should be considered, including: (1) the experience and ability of the attorney; (2) the time and labor required to perform the service properly; (3) the amount in controversy and the result obtained in the

case; (4) the novelty and difficulty of the issues involved; (5) the fee customarily charged for similar services in the local area; (6) whether the fee is fixed or contingent; (7) time limitations imposed upon the client or by the circumstances; and (8) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the attorney. *See Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 229 (1990); "Because of its intimate acquaintance with the record and the quality of the service rendered," the trial court possesses a "superior perspective" from which to assess the applicable factors. *See Phelps v. U.S. Credit Life Ins. Co.*, 340 Ark. 439, 441 (2000). But "[w]hile courts should be guided by [these] factors, there is no fixed formula in determining the reasonableness of an award of attorney's fees." *Id.* at 442. Therefore, "when the trial judge is familiar with the case and the service done by the attorneys, the fixing of a fee is within the discretion of the court." *Hartford Accident & Indem. Co. v. Stewart Bros. Hardware Co.*, 285 Ark. 352, 354 (1985); *see also Burlington N. R.R. Co. v. Farmers Union Oil Co. of Rolla*, 207 F.3d 526, 534 (8th Cir. 2000).

The undersigned trial judge is, of course, extremely familiar with this case, having presided over this matter from beginning to end for more than three and a half years, including no less than eleven hearings and telephone conferences on dispositive and *Daubert* motions and discovery-related matters before trial,[5] ten days of trial, and exhaustive post-trial motion practice. All of which is to say, this Court is extraordinarily and even painfully aware of the microscopic details of every phase of this litigation. And viewing this litigation as a whole, the Court would make several threshold findings.

---

[5] This number does not include the many additional hearings and telephone conferences in this case over which the Magistrate Judge presided.

### 1. Threshold Findings

In this Court's view, there were two primary issues in this case: the parties' Contract, and Cuker's trade secrets. As noted above, this is not to say that breach of contract and trade-secret misappropriation were the only two claims in this case. Rather, what the Court means by this is simply that there was one component of this case that was *primarily* driven by Cuker's trade-secret claims, and one component of this case that was *primarily* driven by the parties' cross-claims for breach of contract. More precisely, the Court believes that roughly two thirds of the time and work in this case was primarily driven by the contract claims, and that roughly one third of the time and work in this case was primarily driven by the trade secret claims.

Subsumed within the component primarily driven by the parties' cross-claims for breach of contract are Cuker's claims for declaratory judgment, fraudulent inducement, and unjust enrichment. As was discussed in Section II.A.2 *supra*, there was a significant amount of overlap at trial in the evidence showing, on the one hand, that Walmart frustrated Cuker's performance under the Contract, and on the other hand, that Cuker was compelled to provide Walmart the out-of-scope templates under protest. Furthermore, all of the claims in this component were litigated in the context of the parties' vastly different interpretations of the Contract; under Walmart's interpretation, the scope of work included *every* template that Cuker delivered (as well as all of Cuker's alleged trade secrets, for that matter). The Court ultimately rejected Walmart's interpretation at summary judgment, and instead interpreted the Contract in a manner that was much more favorable to Cuker's position. This necessarily entailed dismissing Cuker's claims for declaratory judgment and fraudulent inducement, as they were premised on the notions,

respectively, that the Contract was either void for vagueness or procured by deceiving Cuker about the scope of work it would entail. *See* Doc. 197, pp. 3–17. But these claims were inseparably tethered to its defense against Walmart's breach of contract claim (against which Cuker ultimately prevailed at trial), and were only dismissed in light of a judicial interpretation of the Contract that was *favorable* to Cuker. And defending against Walmart's interpretation of the Contract was the primary ingredient baked into nearly two years of heated, torturous, and very expensive litigation that had transpired by that point in the proceedings.

As noted above, the fact that other claims were pursued, does not defeat Cuker's entitlement to fees for an action that was primarily focused on breach of contract. *See Patton Hosp. Mgmt., LLC*, 2016 Ark. App. 281, at *10–*11. As recently as last year, the Arkansas Court of Appeals affirmed a trial court's award of fees on facts strongly analogous to those of the instant case. In *Am. Express Bank, FSB v. Davenport*, the Arkansas Court of Appeals extensively quoted the trial court as follows in a case where multiple claims were pursued:

> I remember this case well. Initially, and on its face in the initial complaint, it would appear to be a simple debt case. It was the other end of the spectrum when it comes to a contract case, at least from this Court's experience. It was unusual, unique, it was a difficult decision. But for an excellently pled and prepared defense, the Defendant would have easily and unjustly been required to pay nearly $14,000 to the Plaintiff. And, frankly, I think in most cases that's what happens, similar to this. The resources available to the plaintiff versus those of the defendant are usually such that there's not a chance. In the absence of, as I say, an extremely well prepared and tried defense, it would have been an unjust result. The counterclaim is an integral part, was an integral part of the defense of the Plaintiff's complaint intertwined to the point that to clearly separate the time spent for pursuing the counterclaim versus what was spent for defending the complaint is almost impossible. It's nevertheless, I think a factor that ought to be considered.

2017 Ark. App. 105, at *6.  The Court of Appeals then held:

> Here, Davenport successfully defended against American Express's breach-of-contract claim, with no judgment being entered against him on that claim.  Because of his successful defense against the contract claim, Davenport could receive an award of attorney's fees under Arkansas Code Annotated section 16-22-308.  All of Davenport's claims—conversion, outrage, and abuse of process—are torts for which attorney's fees are not recoverable.  However, the trial court's comments from the bench, stated above, clearly reflect that the court considered Davenport's counterclaim to be an "integral part" of his defense against American Express's breach-of-contract action.  Because Davenport successfully defended against American Express's breach-of-contract action, and at the end of the case came out "on-top," the trial court did not abuse its discretion in awarding Davenport $30,597.50 in attorney's fees.

*Id.* at *6–*7.  So it is here; and in this Court's view, Cuker is accordingly entitled to collect every dime of reasonable attorney fees associated with the portion of this litigation that was primarily driven by the contract claims, regardless of whether it would have been entitled to attorney fees on each of the claims subsumed within this portion standing alone.

Walmart argues that the Contract's limitation-of-liability clause (previously discussed in Section II.A.5 of this Opinion and Order *supra*) should be applied to cap whatever attorney fees Cuker would otherwise be entitled by statute to recover as a prevailing party on contract claims.  *See* Doc. 480, pp. 7–8.  It is certainly true that under Arkansas law, a written agreement specifically providing for payment of attorney fees is enforceable in accordance with its terms, independent of any statutory authority.  *See Griffin v. First Nat'l Bank*, 318 Ark. 848, 856 (1994).  But the Contract's limitation-of-liability clause, by its plain language, has nothing to do with attorney fees.  In full, and in all capital letters, it reads:

> **Limitation of Liability**.  Under no circumstances is Walmart liable under any theory of tort, contract, strict liability or other legal or equitable theory

for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages or the like, each of which is excluded by agreement of the parties regardless of whether damages were foreseeable or whether Walmart had been advised of the possibility of damages. Walmart's aggregate liability to consultant or any third party for any claims, losses, injuries, suits, demands, judgments, liabilities, costs, expenses or damages for any cause whatsoever (including, but not limited to, those arising out of or related to this Agreement), and regardless of the form of action or legal theory, must not exceed the total fees paid by Walmart under this Agreement. The limitations of liability reflect the allocation of risk between the parties. The limitations specified in this Section 9 survive and apply even if any limited remedy specified in this Agreement is found to have failed of its essential purpose.

Plaintiff's Exhibit 126, p. 5, § 9. The words "attorneys' fees" do not appear anywhere in it. And Walmart obviously knew how to put those words in there if they had wanted the cap to apply to them, given that the words "attorneys' fees" appear in the indemnification clause that *immediately precedes* the limitation-of-liability clause:

**Indemnification**. Consultant must defend, indemnify and hold Walmart harmless from any and all claims, damages, liability, *attorneys' fees* and expenses on account of (i) any suit or claim that the Services, Deliverables, and/or Consultant Intellectual Property infringe the rights of, or misappropriate the property of, any entity or person, including, but not limited to, Intellectual Property Rights; (ii) Consultant's performance of its obligations under this Agreement.

*Id.* at § 8 (emphasis added).

Walmart contends that the limitation-of-liability clause nevertheless contemplates attorney fees through its use of the word "costs," *see* Doc. 480, pp. 7–8, because the governing Arkansas statute, as previously noted, permits the prevailing party in a contract action to "be allowed a reasonable attorney's fee to be assessed by the court and collected as *costs*." *See* Ark. Code Ann. § 16-22-308 (emphasis added). The Court does not buy this argument. The Court believes that in both the Contract and the statute, "attorneys' fees" simply means "attorneys' fees," "costs" simply means "costs," and that

when the statute says "collected as," it simply refers to the manner in which an award of attorney fees may be "collected," rather than to some mysterious transubstantiation. The Contract's limitation-of-liability clause does not apply to attorney fees.

Turning to the remaining third of this litigation, which was primarily driven by Cuker's trade secret claims—as was discussed extensively in Section II of this Opinion and Order, the jury was presented with verdict forms regarding four separate categories of alleged trade secrets, and returned verdicts in favor of Cuker on all four of them, including findings on three of them that the misappropriation was "willful and malicious." *See* Doc. 444, pp. 9–12. But as was also discussed above, the Court finds that Walmart is entitled to judgment as a matter of law as to three of those alleged trade secrets; and, as previously explained, although the Court will let the jury's verdict of willful and malicious misappropriation stand as to one of the trade-secret categories, the Court will significantly reduce the jury's award of damages as to that particular trade secret.

However, the Court does not believe this means that Cuker is only entitled to a small fraction of reasonable attorney fees associated with the portion of this litigation that was primarily driven by its trade secret claims. Although Cuker's trade secret claims were rather broadly stated throughout most of this litigation, Walmart never raised this issue on summary judgment, and instead allowed Cuker to proceed virtually to the eve of trial before asking the Court to compel Cuker to describe specifically the trade secrets that would be argued to the jury.[6] In other words, the soup had already been made by the

---

[6] Walmart filed its only motion for summary judgment on April 7, 2016—more than four months before the discovery cutoff date of August 12 and dispositive motions deadline of August 19. *See* Doc. 71, p. 3; Doc. 86. Perhaps not coincidentally, this filing occurred only seventeen days after Cuker's new counsel of record entered his appearance, replacing Cuker's former attorneys in this case. *See* Doc. 83. Only two of the sixty-two

time trial began, so to speak, such that the time and labor that Cuker's attorneys devoted to its trade secret claims cannot meaningfully be segregated into portions attributable to one category of claimed trade secret versus another. And as described more fully in footnote six, this state of affairs is largely Walmart's fault.

Nevertheless, as noted above, one of the *Chrisco* factors this Court must take into account is "the amount in controversy and the result obtained in the case." 304 Ark. at 229. The Court should credit the fact that Cuker initially obtained a jury verdict of more than $12,000,000 on its trade secret claims—no mean feat, to say the least. But the Court should not overlook the fact that, on Walmart's Rule 50(b) Motion, it has reduced this particular award to $314,392. Ultimately, taking into account the general inseparability of the attorneys' work on one type of claimed trade secret from another in this case, the enormous skill and effort required to obtain such a large jury verdict, and the subsequent significant reduction of that verdict on post-trial motion practice, the Court believes a reasonable attorney fee on Cuker's trade secret claims should be reduced by one third from what it would otherwise be—which is to say, since Cuker's trade secret claims themselves were the primary driver of one third of the time and labor in this

---

pages in Walmart's summary-judgment brief addressed Cuker's trade secret claims, and the only arguments advanced in those two pages dealt with matters of contract interpretation and whether Walmart used "improper means." *See* Doc. 87-1, pp. 50–52. This is not surprising because, of course, trade-secret discovery was far from over at the time of this early filing. Indeed, the following month the Court ordered Walmart to "produce all front-end Walmart2Go code to Cuker by no later than **Friday, June 3, 2016**." (Doc. 103, p. 1) (emphasis in original). Consistent with the general theme of discovery in this case, Walmart still had not satisfactorily complied with that Order even by the time the discovery cutoff and dispositive motions deadline expired. *See, e.g.*, Doc. 150 (order dated September 1, 2016, memorializing ongoing compliance problems). Several months later, when Walmart sought leave to file a second, untimely motion for summary judgment with respect to the trade secret claims, the Court declined to do so in light of the extensive delays the case had already experienced. *See* Doc. 238, pp. 60–62.

litigation, Cuker's overall attorney fee in this case should be reduced by one ninth from what it would otherwise be.

## 2. Calculation of a Reasonable Fee

So now, with those threshold findings out of the way, it is time to determine what that overall attorney fee should be. Cuker has submitted a motion for attorney fees in the lodestar sum of $4,057,709.04, representing the entirety of fees it has incurred, as documented by appropriate affidavits and itemized billing records. *See* Doc. 473-22. The Court will apply the aforementioned eight *Chrisco* factors to determine the extent to which this request is for a *reasonable* attorney fee, but for analytical ease it will do so in a different order from which they were presented above.

The first factor is the experience and ability of Cuker's attorneys. The Court finds all of Cuker's billing attorneys to be well experienced and its attorneys who tried the case to be extraordinarily skilled. Walmart does not challenge this proposition in its briefing.

The second, fourth, and fifth factors are the time and labor required to perform the service properly, the novelty and difficulty of the issues involved, and the fee customarily charged for similar services in the local area, respectively. Walmart does not challenge the necessity of any particular task or quantity of time billed by any of Cuker's principal attorneys. Walmart *does* object to the hourly rates charged by Cuker's non-Arkansas based attorneys and professional support staff. Walmart also objects to any and all fees attributed to the Husch Blackwell law firm, because none of its attorneys ever entered their appearance in this action—and because Cuker has otherwise not met its burden to establish the necessity of that firm's legal services. The Court completely agrees with both sets of criticisms. This Court has consistently held that local rates (or at least

Arkansas attorney rates) are to be used in assessing the reasonableness of the hourly rate in *most* cases. In the last four years, this Court has approved hourly rates in the range of $200 to $300 for commercial and civil rights litigation over which it presides, based on varying degrees of counsel's experience, responsibility, and proficiency. In especially complex litigation, or where the parties have agreed on a particular rate, this Court has approved fees of up to $350 per hour. Here, both the subject matter and the legal issues were exceedingly complex, and Cuker's counsel was among the best prepared that this Court has ever encountered. Walmart suggests a top hourly attorney rate of $385 per hour for partner level experience, and a schedule of lower rates for less experienced attorneys and para-professionals. *See* Doc. 480, pp. 10–12. The Court has carefully compared the suggested rates against rates proposed by Cuker's attorneys and concludes that Walmart's proposal is fair and reasonable in this particular case—and at some of the lower levels is actually quite generous. Thus, the Court adopts all of the hourly rates as proposed by Walmart, and will use and assume the accuracy of Walmart's mathematical computations in the fee calculations below. *See* Doc. 480-6, p. 1.

The Court will not award Husch Blackwell fees because it believes those services to be either redundant or beyond what was reasonably necessary to litigate the case. Walmart does not raise any other objections based on the quantity of Cuker's attorneys' time, and therefore this Court will make its calculations below based on the full quantity as documented.

The third factor to consider is the amount in controversy and the result obtained in the case. The amount in controversy was in excess of $12 million—at least from the perspective of the jurors. For Cuker, the stakes were tantamount to bet-the-company

litigation, or at least something close to that. And Mr. Cuker testified credibly about Walmart's threats of crushing Cuker if their dispute necessitated litigation. In the context of this David versus Goliath type of case, Cuker obtained excellent results. It substantially prevailed on the primary contract claims and defenses, and it was successful in convincing the jury that it should prevail across the board on its trade secret claims. For the reasons explained above, the fact that the Court set aside a large portion of those trade secret claims does not diminish the significance of Cuker's feat, nor should the discount for this Court's Rule 50(b) rulings be measured in a *pro rata* manner. Instead, as discussed above, the Court will reduce the fees that it attributes to the trade secret claims by one third.

The sixth factor is whether the fee is fixed or contingent. It is undisputed that Cuker's fees were incurred on an hourly basis, and therefore the Court has no need to entertain the reasonableness of awarding a percentage contingency fee.

The seventh factor is time limitations imposed upon the client or by the circumstances. The Court is persuaded that considerations related to time constraints weigh heavily in Cuker's favor. Walmart's discovery abuses, including what appears to have been a run-out-the-clock strategy of intentional delays and baseless representations, had the effect of significantly multiplying Cuker's attorney fees, because of the need to counteract those measures in a limited and compressed amount of time in the last few months before trial. The Court therefore finds that Cuker would ordinarily be entitled to a lodestar multiplier to account for these circumstances. However, as explained further below, the Court intends to impose new sanctions against Walmart, and the

reasons for the lodestar multiplier contemplated here are completely enveloped by the larger set of reasons that account for the award of sanctions.

And the eighth and final factor is, if known to the client, the preclusion of other employment by the attorney. The Court does not find any evidence in the record to suggest that the preclusion of attorney employment is a factor that weighs heavily in either direction.

Based on the findings above, the Court calculates and summarizes Cuker's entitlement to a reasonable fee as follows:

1. Total fee request:                                          $4,057,709.04

2. Revised total fee to reflect local rates:                  $2,665,597.94

3. Further Revised total to exclude Husch fees:               $2,445,831.64

4. **Apportion 2/3 of fees to Contract Related Claims:**       **$1,630,555.24**

5. Apportion 1/3 of fees to Trade Secret Claims:             $  815,276.40

6. **Trade Secret Fees when reduced by 1/3:**                 **$  543,517.87**

7. **Total Combined Contract and Trade Secret Fees:**         **$2,174,073.11**

Accordingly, Cuker's Motion for Attorney's Fees and Costs (Doc. 473) is therefore **GRANTED IN PART AND DENIED IN PART.** Cuker is awarded a total of $2,174,073.11 in attorney fees.

### 3. Nontaxable Expenses

In addition to its attorney fees, Cuker also seeks to recover attorney travel expenses and expert witness fees in the total sum of $720, 991.84, which it characterizes as costs that are not taxable pursuant to 28 U.S.C. § 1920. Cuker relies on Rule 54(d)(2), which provides that "[a] claim for attorney's fees and related nontaxable expenses must

be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Cuker then relies on multiple federal cases where fees and expenses were deemed recoverable pursuant to causes of action arising under federal law. Such reliance is misplaced, and the Court will not allow the recovery of such expenses in this diversity case brought pursuant to Arkansas law.

Rule 54(d)(2) "establishes a procedure for presenting claims for attorneys' fees, whether or not denominated as 'costs.' It applies also to requests for reimbursement of expenses, not taxable as costs, when recoverable under *governing law incident to* the award of fees." Fed. R. Civ. P. 54(d)(2) Advisory Committee's Note to the 1993 Amendment (emphasis added). In a diversity case, state law supplies the governing law for substantive issues, including attorney fees. *See Lamb Engineering & Constr. v. Neb. Pub. Power Dist.*, 103 F.3d 1422, 1434 (8th Cir. 1997) (collecting cases); *see also GeoVera Specialty Ins. Co. v. Graham Rogers, Inc.*, 2010 WL 3327688, at *1 (E.D. Ark. Aug. 23, 2010). Therefore, Arkansas law governs whether nontaxable costs are recoverable in this case. *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 2011 WL 2160928, at *7 (S.D. Tex. May 27, 2011) ("Thus, the movant's 'non-taxable expenses' are recoverable along with attorney's fees on a motion under Rule 54(d)(2), so long as they are recoverable under . . . state law.").

As explained above, Ark. Code Ann. § 16-22-308 allows for the award of attorney fees in breach of contract cases, and Ark. Code Ann. § 4-75-607 allows for the award of attorney fees for the willful and malicious misappropriation of trade secrets. However, the Arkansas Supreme Court has narrowly construed the types of fees recoverable under state law to those specifically enumerated by a state statute. This result is partly reflected

in Ark. R. Civ. P. 54(e), which governs awards of attorney fees and nontaxable expenses. That rule, just like its federal counterpart, requires the moving party to "specify the judgment and the statute or rule entitling the moving party to the award." Thus, Arkansas cases have rejected attempts to include any number of categories of ordinary and incidental expenses of litigation as either costs or as recoverable miscellaneous expenses. *See, e.g.*, *Sunbelt Exploration Co. v. Stephens Production Co.*, 320 Ark. 298, 309 (1995) (finding that depositions, expert fees, and travel expenses are not permissible costs). While the word "costs" is a legal term of art, referring to a variety of specifically enumerated categories of recoverable expenditures rather than to any and all "expenses," Arkansas courts have made clear that miscellaneous litigation expenses, whether described as costs or as nontaxable expenses, may not be recovered absent statutory authority for doing so. *See, e.g.*, *W.A. Krueger Co. v. St. Bernard's Reg'l Med. Ctr.*, 267 Ark. 180, 181 (1979) (holding that certain miscellaneous expenses incidental to litigation were "not recoverable, as costs or otherwise, absent a statute so providing"). Cuker's request for nontaxable costs is therefore **DENIED**.

### 4. Taxable Costs

Cuker has filed a  Bill of Taxable Costs (Doc. 475) seeking to recover a total $89,889.37 pursuant to 28 U.S.C. § 1920. Walmart objects (Doc. 476) because (1) Cuker failed to timely file an affidavit verifying that the costs were correct and were for services actually and necessarily incurred; and (2) certain of the expenses are not properly recoverable under § 1920. The Court disagrees.

As a threshold matter, Walmart argues that Cuker did not attach a verification to its Bill of Costs as required by 28 U.S.C. § 1924, attesting to the accuracy of the amounts

and that the expenses were necessarily incurred in the case. While it is true that an affidavit was not attached to Cuker's Bill of Taxable Costs filed on May 24, 2017 (Doc. 475), the Court finds that Cuker has nevertheless complied with § 1924's mandatory verification requirement. In making this finding, the Court takes judicial notice of (1) the affidavits of Cuker's attorneys that were filed separately on May 24, 2017, in support of its Motion for Attorney's Fees and Costs (Doc. 473); and (2) the supplemental affidavit of Cuker's counsel filed on June 21, 2017 (Doc. 481-1). These affidavits collectively itemize the same costs at issue here, contain the verification language required by § 1924, and were filed "[b]efore any bill of costs [was actually] taxed by the Court. 28 U.S.C. § 1924.

Walmart next quarrels with $42,035.76 in transcript related costs that Cuker seeks to recover pursuant to § 1924(2). In support, Walmart cites to then-District Judge Morris Arnold's explanation that "[t]he rule . . . in this district is that, absent special showing, costs will not be taxed for depositions not used at trial. *Nelson v. Darragh Company*, 120 F.R.D. at 517, 519 (1988). Notwithstanding that observation, the Eighth Circuit has since required a much lower threshold. In *Zotos v. Lindbergh School District*, the Eighth Circuit held that "even if a deposition is not introduced at trial, a district court has discretion to award costs if the deposition was "necessarily obtained for use in [a] case" and was not "purely investigative." 121 F.3d 356, 363 (8th Cir. 1997) (quoting *Slagenweit v. Slagenweit*, 63 F.3d 719, 720 (8th Cir. 1995) (per curiam)). In fact, Judge Arnold's opinion in *Nelson* cited to another Eighth Circuit case, *Koppinger v. Cullen-Schiltz & Associates*, where the panel affirmed a trial court that had allowed deposition expenses to be taxed, even when not used at trial, where they were "reasonably necessary to the case and were

not purely investigative in nature." 513 F.2d 901, 911 (8th Cir. 1975). *See also Smith v. Tenet Healthsystem, SL, Inc.,* 436 F.3d 879, 889 (8th Cir.2006) ("Even if a deposition is not introduced at trial, a district court has discretion to award costs if the deposition was necessarily obtained for use in a case and was not purely investigative." (quotations and modifications omitted). Wright and Miller also confirm that the general trend in the federal courts tends to be that "[w]hen a deposition is not actually used at trial or as evidence on some successful preliminary motion, whether its cost may be taxed generally is determined by deciding if the deposition reasonably seemed necessary at the time it was taken." *10 Federal Practice and Procedure Civil* § 2676 (3d ed.).

Almost every fact and expert witness in this case resided and worked outside this district. As late as a pre-trial conference conducted on January 3, 2017, Walmart---the plaintiff in this action who would present its case first at trial---wasn't even sure which of its witnesses would be called live versus produced by deposition. In fact, the working assumption up to that point was that most of Walmart's witnesses would *not* be presented live. (Doc. 237, pp 6-27). To that end, arduous amounts of time were consumed by the parties' deposition designations and objections, respectively. So, regardless of whatever history Walmart may be seeking to reinvent now, the Court is overwhelmingly persuaded that all the depositions, transcripts, and videos now at issue were taken with either the specific intention of being necessary for use at trial, or were *actually* used at trial. Therefore, the Court will tax as costs all of Cuker's requested expenses related to transcripts and videotaped depositions in the total sum of $42,035.76.

Next, Walmart contests $720 in witness fees that Cuker requests pursuant § 1920(3), contending that insufficient proof exists as to whether these fees were incurred.

The Court takes judicial notice of the actual appearance of these witnesses at trial, and combined with the affidavits mentioned above, the Court finds that Cuker has meet its burden, and therefore these costs will be allowed in the sum of $720.00.

Finally, Walmart protests Cuker's request, pursuant to § 1920(4), for $47,133.61 in costs related to exemplification and copying of materials necessarily obtained for use in the case. According to Walmart, Cuker has presented insufficient proof of such expenses, and in any event, expenses associated with electronically stored and produced discovery materials are not taxable. The Court disagrees.

A judge or court clerk acting pursuant to Rule 54(d)(1) "may tax as costs," among other things, fees for copies of any materials necessarily obtained for use in the case. 28 U.S.C. § 1920(4). Judge Susan Weber Wright, in *B & B Hardware, Inc. v. Fastenal Co.*, 2011 WL 6829625, at *6 (E.D. Ark. Dec. 16, 2011), aff'd, 688 F.3d 917 (8th Cir. 2012), collected cases explaining the parties' respective burdens of proof under Rule 54(d)(1). "[C]osts other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." *Brisco–Wade v. Carnahan,* 297 F.3d 781, 782 (8th Cir.2002) (per curiam). *See also Concord Boat Corp. v. Brunswick Corp.,* 309 F.3d 494, 498 (8th Cir.2002) (noting that when an expense, such as necessary photocopies, is taxable as a cost, there is a strong presumption that a prevailing party shall recover it in full measure) (internal quotation and citation omitted). "The losing party bears the burden of making the showing that an award is inequitable under the circumstances." *Id. See also 168th and Dodge, LP v. Rave Reviews Cinemas, LLC,* 501 F.3d 945, 958 (8th Cir.2007) (a prevailing party is presumptively entitled to recover all of its costs and the losing party bears the burden of overcoming the presumption that the prevailing party is

entitled to costs, meaning that the losing party must suggest a rationale under which the district court's actions constitute an abuse of discretion). Here, this Court finds that Cuker has provided more than sufficient proof to meet its threshold burden, and Walmart has failed to persuade the Court otherwise.

With regard to Walmart's more specific argument about expenses for electronically produced materials, it is true that "[c]ourts within the Eastern District of Arkansas have generally determined that costs incurred in copying documents to be produced during discovery are not taxable as costs under § 1920(4)." *B & B Hardware, Inc.,* 2011 WL 6829625, at *6–7 (E.D. Ark. Dec. 16, 2011)(collecting cases), *aff'd.* 688 F.3d 917 (8th Cir. 2012). However, as Judge Wright pointed out in that same ruling, other district courts in this circuit have more recently been of the opinion that electronic scanning of documents is the modern-day equivalent of 'exemplification and copies of paper,' and, therefore, can be taxed pursuant to § 1920(4)." *Id.* This Court agrees with Judge Wright, especially in the context of the highly technical computer code involved here, and because of the extent to which both sides made use of digital storage and production of vast amounts of ESI in discovery, portions of which were introduced at trial on an external hard drive.

Therefore, the Court finds that all of Cuker's electronic exemplification costs should be awarded, because "the electronic scanning of documents is the modern-day equivalent of exemplification and copies of paper, and, therefore, can be taxed pursuant to § 1920(4)." *See BDT Prods., Inc. v. Lexmark Int'l, Inc.,* 405 F.3d 415, 420 (6th Cir.2005) (finding no abuse of discretion in the district court's taxing of copying costs and stating that "electronic scanning and imaging could be interpreted as 'exemplification and

copies of papers'" (quoting 28 U.S.C. § 1920(4)). Cuker's exemplification costs are awarded in the total sum of $47,133.61.

To summarize, all of Walmart's arguments are rejected, and Cuker is **AWARDED TAXABLE COSTS** in the total sum of $89,889.37.

### B. Cuker's Motion for Sanctions against Walmart and its Counsel (Doc. 464)

Cuker seeks sanctions against Walmart for abuses that Walmart committed over a period of several years in this case. Throughout this case, Walmart has engaged in litigation practices that have repeatedly met with this Court's disapproval, extreme frustration, and sometimes even sanctions. For example, on October 9, 2015, the Court found that Walmart had "abused the discovery process" by egregiously over-designating documents it produced in discovery as "confidential" or "attorneys' eyes only," thereby frustrating Cuker's ability to conduct an efficient and meaningful review of those documents. *See* Doc. 62. The Court has already mentioned earlier in this Opinion and Order that Walmart failed even remotely to comply with an Order that it produce "all front-end Walmart2Go code to Cuker" by June 23, 2016. *See* note 6, *supra*. The Court eventually ended up awarding Cuker attorney fees and expenses that it reasonably incurred in compelling Walmart's production of the Walmart2Go code. *See* Doc. 235. By August 2016, the Court had become so frustrated with Walmart's repeated discovery abuses that it ordered Walmart "to designate an officer of the company with appropriate managerial understanding and oversight of these claims and these issues involved in this suit and involved in this discovery dispute," and stated that it might "require that Walmart designate an officer to attend any and all future hearings, phone conferences, et cetera," because "somebody from Walmart" needed to be involved who "can be accountable to

be sure that Walmart is fully engaged and accountable and can be the face for Walmart in these issues going forward." *See* Doc. 143-1, pp. 40–46.

On January 3, 2017, the Court ordered Walmart to provide certain financial information to Cuker by January 17. *See* Doc. 237, pp. 44–45. After that deadline passed without compliance, without any request for an extension, and on the heels of yet another motion to compel from Cuker, Walmart responded that it "needs more time to search for this information, given the Christmas selling season and the January 31 fiscal year end," *see* Doc. 234, p. 4, which left the Court with the distinct impression that Walmart "apparently is just not taking either this litigation seriously or this Court's orders seriously, and that's got to change," *see* Doc. 238, pp. 18–23. The Court required Walmart "to designate a nonlawyer, high-level executive with management responsibility over the financial records at issue," who "will have full operational authority to prioritize compliance with the Court's order and to ensure that all necessary resources are dedicated to meet the deadlines that either the Court has imposed or the parties have agreed upon." *See id.* at 25. The Court further ordered that "[s]hould the Court have to take up any of these issues again because deadlines have not been met, that executive shall be in attendance at the Court's hearing to account for why [Walmart] has not prioritized compliance with the Court's orders." *Id.* The Court also required the parties to conduct periodic joint telephone conferences with a Magistrate Judge "on no less than a weekly basis" in order to ensure that financial discovery stayed on track. *See id.* at 27. And as the Court has already described earlier in this Opinion and Order, even after that extraordinary step was taken, Walmart still failed to timely produce financial discovery, leading this Court to sanction it by ruling that it had waived its opportunity to file an expert report on damages

or to file any pretrial motions challenging Dr. Kennedy's expert report on trade secret damages, which in turn led to the issuance of a show-cause order after Walmart failed to comply even with *that* sanction. *See* note 2, *supra*.

There is much more that could be said about Walmart's abusive tactics in this case; Cuker spends fifty-five pages doing so in its Brief in Support of it Motion for Sanctions, and at least so far as the facts described therein go, there is very little with which this Court would disagree—except that while the Court agrees that Walmart's attorneys or employees have on several occasions made inaccurate representations to the Court, it does not go so far as to conclude they ever did so intentionally or in bad faith. *See* Doc. 465, pp. 14–16, 40–41. But suffice it to say that on the whole, and in cumulative effect, Walmart's litigation practices in this case have likely been the most vexatious, oppressive, and abusive ever to have occurred in any case before the undersigned in this Court. And over time, those practices had the practical effect of unnecessarily turning a complicated and expensive but manageable case into bet-the-company litigation for the opposing party and countless hours of wasted time for court staff. In its briefing, Walmart seems to acknowledge at least some amount of regret for its actions. Hopefully Walmart understands going forward that such abuses will not be tolerated, that the Court's orders must be obeyed in the first instance, and that this Court will not allow pointless trench warfare in discovery.

As for *this* case, additional sanctions are not only appropriate, but necessary to maintain the integrity of this Court's discovery orders and the interests of justice. Considering only the fees and expenses that Cuker has *actually* incurred to date, the Amended Judgment here will fall far short of making it whole in an economic sense. But

the Court does *not* believe that any sanction it imposes on Walmart for all of this should result in a windfall for Cuker. At the end of the day, this Court's primary concern is that justice be done, and justice requires proportionality. Of great significance to the Court on this point is that, in the end, Cuker prevailed at trial, is being awarded damages commensurate with what the evidence at trial showed, and is being permitted to recover reasonable attorney fees and costs, all as determined by applicable law.

Thus, when the dust settles and the Amended Judgment is executed, the Court believes Cuker will have been made whole *under the law*, and any new sanctions must be measured with the understanding that certain monetary *and evidentiary* sanctions have been imposed and taken a certain toll upon Walmart already. In light of this, the Court believes that Cuker's preferred sanction—striking Walmart's pleadings and awarding default judgment to Cuker—is far too severe. And the Court believes Cuker's alternative proposal—awarding Cuker *all* of its costs, expenses, and attorney fees incurred throughout the entirety of this litigation—would also be disproportionate, given that the Court has already awarded Cuker its *reasonable* attorney fees and costs in this Opinion and Order.

That said, Walmart has not yet been made to fully account for the cumulative effect of its abusive practices in this case. Therefore, the Court believes that Walmart's alternative proposal—a sanction of $74,189.00, amounting to half of the expert and attorney fees that Cuker incurred *during the period* of *January 27, 2017 to March 27, 2017* in this case—is appropriate to account for the specific abuses which occurred during *that* period of time. Additionally, to account for the *cumulative effect* of Walmart's abusive practices throughout the litigation as a whole, the Court will impose a monetary sanction

in a sum of $326,110.96, which is equal to 15% of the reasonable attorney fee award as calculated above. This formula is proportional inasmuch as it reflects the cumulative extent to which this Court finds Walmart's actions to have vexatiously multiplied these proceedings. In total, the Court imposes new sanctions against Walmart in the combined sum of $400,299.96.

Accordingly, Cuker's Motion for Sanctions will be **GRANTED IN PART AND DENIED IN PART**. The Court imposes the new $400,299.96 sanction pursuant to its inherent authority "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases," by assessing fees when a party has acted "vexatiously, wantonly, or for oppressive reasons." *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 45–46 (1991). So as to ensure that the new sanction is not merely illusory, in whole or in part, the new sanction will be imposed *in addition* to the $2,263,962.48 in combined attorney fees and taxable costs that the Court awarded Cuker in the previous subsection of this Opinion and Order, resulting in a total award to Cuker of $2,664,262.44 in combined attorney fees, costs, and new sanctions.

Finally, the Court would emphasize that the relief Cuker has obtained in this case apart from this sanction is critical to this Court's analysis of what a just and appropriate sanction would be. So if the Amended Judgment in this case is reversed in any part on appeal, then this Court would likely consider that to be appropriate cause for Cuker to move in this forum on remand for reconsideration of this ruling on its Motion for Sanctions.

## IV. CUKER'S MOTIONS TO WITHDRAW

The final matters to take up are the Motions to Withdraw (Docs. 520, 522) filed by Cuker's counsel of record in this case. Cuker's attorneys inform the Court that Cuker has

not complied with its written engagement agreements with them, and therefore they seek leave to withdraw pursuant to Local Rule 83.5(f). The Court finds that Cuker's attorneys have complied with Local Rule 83.5(f) and all other ethical responsibilities associated with withdrawing from client representation. Therefore, the Motions to Withdraw filed by Cuker's attorneys will be **GRANTED**.

Since Cuker is a limited liability company, it cannot represent itself *pro se*. *See Ackra Direct Marketing Corp. v. Fingerhut Corp.*, 86 F.3d 852, 857 (8th Cir. 1996). However, this case is closed, an Amended Judgment is being filed contemporaneously with this Opinion and Order, and the Court does not anticipate any further motion practice or briefing occurring, other than any appeal that may be filed in the Eighth Circuit, which is of course a different forum from this one. Therefore, Cuker will not be required at this time to secure new counsel and have that counsel enter an appearance in this matter. However, Cuker will be required to have new counsel enter an appearance in this matter prior to making any further filings in this matter. All of the attorneys being granted leave here to withdraw are directed to provide Cuker with a copy of this Opinion and Order and its accompanying Amended Judgment, along with an appropriate cover letter of explanation that states that the Court has permitted these attorneys to withdraw from the case as attorneys of record, and that Cuker may not make any further filings in this matter until new counsel has entered an appearance in this matter on Cuker's behalf.

## V. CONCLUSION

**IT IS THEREFORE ORDERED** that Cuker's Motion for Sanctions against Walmart and its Counsel (Doc. 464) is **GRANTED IN PART AND DENIED IN PART**; Cuker's Motion for Attorneys' Fees and Costs (Doc. 473) is **GRANTED IN PART AND DENIED**

**IN PART**; Walmart's Motion for Judgment as a Matter of Law under Rule 50(b) (Doc. 490)

is **GRANTED IN PART AND DENIED IN PART**; Walmart's Motion for New Trial or

Remittitur under Rule 59 (Doc. 493) is **DENIED**; the Motion to Withdraw filed by attorneys

Mark Murphey Henry and Adam L. Hopkins (Doc. 520) is **GRANTED**; and the Motion to

Withdraw filed by attorneys Callie A. Bjurstrom and Michelle A. Herrera (Doc. 522) is

**GRANTED**, as follows: an Amended Judgment will be entered contemporaneously with

this Order, awarding Cuker $745,021.00 in damages, a total of $2,664,262.44 in attorney

fees, costs, and sanctions, and injunctive relief pertaining to Cuker's Adobe Source Files.

    **IT IS FURTHER ORDERED** that all of the attorneys being granted leave here to

withdraw are to file of record an appropriate affidavit of delivery that explains the evidence

or their actual knowledge of Cuker's actual receipt of this Order and of its accompanying

Amended Judgment, and that otherwise indicates their compliance with this Order.  The

affidavit shall also provide an address at which service of any further filings in this matter

may properly be made on Cuker.  Upon the filing of such affidavit, the filing attorney shall

be completely relieved of all further responsibilities in this case.

    **IT IS SO ORDERED** on this ___31st___ day of March, 2018.


                                     _____
                                       TIMOTHY L. BROOKS
                                     UNITED STATES DISTRICT JUDGE